Chief Justice ROBERTSdelivered the opinion of the Court.
Federal law makes it a crime to transmit in interstate commerce "any communication containing any threat ... to injure the person of another." 18 U.S.C. § 875(c). Petitioner was convicted of violating this provision under instructions that required the jury to find that he communicated what a reasonable person would regard as a threat. The question is whether the statute also requires that the defendant be aware of the threatening nature of the communication, and-if not-whether the First Amendment requires such a showing.
I
A
Anthony Douglas Elonis was an active user of the social networking Web site Facebook. Users of that Web site may post items on their Facebook page that are accessible to other users, including Facebook "friends" who are notified when new content is posted. In May 2010, Elonis's wife of nearly seven years left him, taking with her their two young children. Elonis began "listening to more violent music" and posting self-styled "rap" lyrics inspired by the music. App. 204, 226.
*2005 Eventually, Elonis changed the user name on his Facebook page from his actual name to a rap-style nom de plume, "Tone Dougie," to distinguish himself from his "on-line persona." Id., at 249, 265. The lyrics Elonis posted as "Tone Dougie" included graphically violent language and imagery. This material was often interspersed with disclaimers that the lyrics were "fictitious," with no intentional "resemblance to real persons." Id.,at 331, 329. Elonis posted an explanation to another Facebook user that "I'm doing this for me. My writing is therapeutic." Id.,at 329; see also id., at 205 (testifying that it "helps me to deal with the pain").
Elonis's co-workers and friends viewed the posts in a different light. Around Halloween of 2010, Elonis posted a photograph of himself and a co-worker at a "Halloween Haunt" event at the amusement park where they worked. In the photograph, Elonis was holding a toy knife against his co-worker's neck, and in the caption Elonis wrote, "I wish." Id.,at 340. Elonis was not Facebook friends with the co-worker and did not "tag" her, a Facebook feature that would have alerted her to the posting. Id.,at 175; Brief for Petitioner 6, 9. But the chief of park security was a Facebook "friend" of Elonis, saw the photograph, and fired him. App. 114-116; Brief for Petitioner 9.
In response, Elonis posted a new entry on his Facebook page:
"Moles! Didn't I tell y'all I had several? Y'all sayin' I had access to keys for all the f***in' gates. That I have sinister plans for all my friends and must have taken home a couple. Y'all think it's too dark and foggy to secure your facility from a man as mad as me? You see, even without a paycheck, I'm still the main attraction. Whoever thought the Halloween Haunt could be so f***in' scary?" App. 332.
This post became the basis for Count One of Elonis's subsequent indictment, threatening park patrons and employees.
Elonis's posts frequently included crude, degrading, and violent material about his soon-to-be ex-wife. Shortly after he was fired, Elonis posted an adaptation of a satirical sketch that he and his wife had watched together. Id.,at 164-165, 207. In the actual sketch, called "It's Illegal to Say ...," a comedian explains that it is illegal for a person to say he wishes to kill the President, but not illegal to explain that it is illegal for him to say that. When Elonis posted the script of the sketch, however, he substituted his wife for the President. The posting was part of the basis for Count Two of the indictment, threatening his wife:
"Hi, I'm Tone Elonis.
Did you know that it's illegal for me to say I want to kill my wife? ...
It's one of the only sentences that I'm not allowed to say....
Now it was okay for me to say it right then because I was just telling you that it's illegal for me to say I want to kill my wife....
Um, but what's interesting is that it's very illegal to say I really, really think someone out there should kill my wife....
But not illegal to say with a mortar launcher.
Because that's its own sentence....
I also found out that it's incredibly illegal, extremely illegal to go on Facebook and say something like the best place to fire a mortar launcher at her house would be from the cornfield behind it because of easy access to a getaway road and you'd have a clear line of sight through the sun room....
*2006 Yet even more illegal to show an illustrated diagram. [diagram of the house]...." Id.,at 333.
The details about the home were accurate. Id.,at 154. At the bottom of the post, Elonis included a link to the video of the original skit, and wrote, "Art is about pushing limits. I'm willing to go to jail for my Constitutional rights. Are you?" Id.,at 333.
After viewing some of Elonis's posts, his wife felt "extremely afraid for [her] life." Id.,at 156. A state court granted her a three-year protection-from-abuse order against Elonis (essentially, a restraining order). Id.,at 148-150. Elonis referred to the order in another post on his "Tone Dougie" page, also included in Count Two of the indictment:
"Fold up your [protection-from-abuse order] and put it in your pocket
Is it thick enough to stop a bullet?
Try to enforce an Order
that was improperly granted in the first place
Me thinks the Judge needs an education
on true threat jurisprudence
And prison time'll add zeros to my settlement ...
And if worse comes to worse
I've got enough explosives
to take care of the State Police and the Sheriff's Department." Id.,at 334.
At the bottom of this post was a link to the Wikipedia article on "Freedom of speech." Ibid.Elonis's reference to the police was the basis for Count Three of his indictment, threatening law enforcement officers.
That same month, interspersed with posts about a movie Elonis liked and observations on a comedian's social commentary, id.,at 356-358, Elonis posted an entry that gave rise to Count Four of his indictment:
"That's it, I've had about enough
I'm checking out and making a name for myself
Enough elementary schools in a ten mile radius to initiate the most heinous school shooting ever imagined
And hell hath no fury like a crazy man in a Kindergarten class
The only question is ... which one?" Id.,at 335.
Meanwhile, park security had informed both local police and the Federal Bureau of Investigation about Elonis's posts, and FBI Agent Denise Stevens had created a Facebook account to monitor his online activity. Id.,at 49-51, 125. After the post about a school shooting, Agent Stevens and her partner visited Elonis at his house. Id.,at 65-66. Following their visit, during which Elonis was polite but uncooperative, Elonis posted another entry on his Facebook page, called "Little Agent Lady," which led to Count Five:
"You know your s***'s ridiculous
when you have the FBI knockin' at yo' door
Little Agent lady stood so close
Took all the strength I had not to turn the b**** ghost
Pull my knife, flick my wrist, and slit her throat
Leave her bleedin' from her jugular in the arms of her partner
[laughter]
So the next time you knock, you best be serving a warrant
And bring yo' SWAT and an explosives expert while you're at it
Cause little did y'all know, I was strapped wit' a bomb
Why do you think it took me so long to get dressed with no shoes on?
*2007 I was jus' waitin' for y'all to handcuff me and pat me down
Touch the detonator in my pocket and we're all goin'
[BOOM!]
Are all the pieces comin' together?
S***, I'm just a crazy sociopath
that gets off playin' you stupid f***s like a fiddle
And if y'all didn't hear, I'm gonna be famous
Cause I'm just an aspiring rapper who likes the attention
who happens to be under investigation for terrorism
cause y'all think I'm ready to turn the Valley into Fallujah
But I ain't gonna tell you which bridge is gonna fall
into which river or road
And if you really believe this s***
I'll have some bridge rubble to sell you tomorrow
[BOOM!][BOOM!][BOOM!]" Id.,at 336.
B
A grand jury indicted Elonis for making threats to injure patrons and employees of the park, his estranged wife, police officers, a kindergarten class, and an FBI agent, all in violation of 18 U.S.C. § 875(c). App. 14-17. In the District Court, Elonis moved to dismiss the indictment for failing to allege that he had intended to threaten anyone. The District Court denied the motion, holding that Third Circuit precedent required only that Elonis "intentionally made the communication, not that he intended to make a threat." App. to Pet. for Cert. 51a. At trial, Elonis testified that his posts emulated the rap lyrics of the well-known performer Eminem, some of which involve fantasies about killing his ex-wife. App. 225. In Elonis's view, he had posted "nothing ... that hasn't been said already." Id.,at 205. The Government presented as witnesses Elonis's wife and co-workers, all of whom said they felt afraid and viewed Elonis's posts as serious threats. See, e.g., id.,at 153, 158.
Elonis requested a jury instruction that "the government must prove that he intended to communicate a true threat." Id.,at 21. See also id.,at 267-269, 303. The District Court denied that request. The jury instructions instead informed the jury that
"A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual." Id.,at 301.
The Government's closing argument emphasized that it was irrelevant whether Elonis intended the postings to be threats-"it doesn't matter what he thinks." Id.,at 286. A jury convicted Elonis on four of the five counts against him, acquitting only on the charge of threatening park patrons and employees. Id.,at 309. Elonis was sentenced to three years, eight months' imprisonment and three years' supervised release.
Elonis renewed his challenge to the jury instructions in the Court of Appeals, contending that the jury should have been required to find that he intended his posts to be threats. The Court of Appeals disagreed, holding that the intent required by Section 875(c)is only the intent to communicate words that the defendant understands, and that a reasonable person would view as a threat. 730 F.3d 321, 332 (C.A.3 2013).
*2008 We granted certiorari. 573 U.S. ----, 134 S.Ct. 2819, 189 L.Ed.2d 784 (2014).
II
A
An individual who "transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another" is guilty of a felony and faces up to five years' imprisonment. 18 U.S.C. § 875(c). This statute requires that a communication be transmitted and that the communication contain a threat. It does not specify that the defendant must have any mental state with respect to these elements. In particular, it does not indicate whether the defendant must intend that his communication contain a threat.
Elonis argues that the word "threat" itself in Section 875(c)imposes such a requirement. According to Elonis, every definition of "threat" or "threaten" conveys the notion of an intent to inflict harm. Brief for Petitioner 23. See United States v. Jeffries,692 F.3d 473, 483 (C.A.6 2012)(Sutton, J., dubitante). E.g.,11 Oxford English Dictionary 353 (1933) ("to declare (usually conditionally) one's intention of inflicting injury upon"); Webster's New International Dictionary 2633 (2d ed. 1954) ("Law,specif., an expression of an intention to inflict loss or harm on another by illegal means"); Black's Law Dictionary 1519 (8th ed. 2004) ("A communicated intent to inflict harm or loss on another").
These definitions, however, speak to what the statement conveys-not to the mental state of the author. For example, an anonymous letter that says "I'm going to kill you" is "an expression of an intention to inflict loss or harm" regardless of the author's intent. A victim who receives that letter in the mail has received a threat, even if the author believes (wrongly) that his message will be taken as a joke.
For its part, the Government argues that Section 875(c)should be read in light of its neighboring provisions, Sections 875(b)and 875(d). Those provisions also prohibit certain types of threats, but expressly include a mental state requirement of an "intent to extort." See 18 U.S.C. § 875(b)(proscribing threats to injure or kidnap made "with intent to extort"); § 875(d)(proscribing threats to property or reputation made "with intent to extort"). According to the Government, the express "intent to extort" requirements in Sections 875(b)and (d)should preclude courts from implying an unexpressed "intent to threaten" requirement in Section 875(c). See Russello v. United States,464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").
The Government takes this expressio unius est exclusio alteriuscanon too far. The fact that Congress excluded the requirement of an "intent to extort" from Section 875(c)is strong evidence that Congress did not mean to confine Section 875(c)to crimes of extortion. But that does not suggest that Congress, at the same time, also meant to exclude a requirement that a defendant act with a certain mental state in communicating a threat. The most we can conclude from the language of Section 875(c)and its neighboring provisions is that Congress meant to proscribe a broad class of threats in Section 875(c), but did not identify what mental state, if any, a defendant must have to be convicted.
In sum, neither Elonis nor the Government has identified any indication of a *2009 particular mental state requirement in the text of Section 875(c).
B
The fact that the statute does not specify any required mental state, however, does not mean that none exists. We have repeatedly held that "mere omission from a criminal enactment of any mention of criminal intent" should not be read "as dispensing with it." Morissette v. United States,342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." Id.,at 252, 72 S.Ct. 240.As Justice Jackson explained, this principle is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." Id.,at 250, 72 S.Ct. 240. The "central thought" is that a defendant must be "blameworthy in mind" before he can be found guilty, a concept courts have expressed over time through various terms such as mens rea,scienter, malice aforethought, guilty knowledge, and the like. Id., at 252, 72 S.Ct. 240; 1 W. LaFave, Substantive Criminal Law § 5.1, pp. 332-333 (2d ed. 2003). Although there are exceptions, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." United States v. Balint,258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922). We therefore generally "interpret [ ] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." United States v. X-Citement Video, Inc.,513 U.S. 64, 70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994).
This is not to say that a defendant must know that his conduct is illegal before he may be found guilty. The familiar maxim "ignorance of the law is no excuse" typically holds true. Instead, our cases have explained that a defendant generally must "know the facts that make his conduct fit the definition of the offense," Staples v. United States,511 U.S. 600, 608, n. 3, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), even if he does not know that those facts give rise to a crime.
Morissette,for example, involved an individual who had taken spent shell casings from a Government bombing range, believing them to have been abandoned. During his trial for "knowingly convert[ing]" property of the United States, the judge instructed the jury that the only question was whether the defendant had knowingly taken the property without authorization. 342 U.S., at 248-249, 72 S.Ct. 240. This Court reversed the defendant's conviction, ruling that he had to know not only that he was taking the casings, but also that someone else still had property rights in them. He could not be found liable "if he truly believed [the casings] to be abandoned." Id.,at 271, 72 S.Ct. 240; see id.,at 276, 72 S.Ct. 240.
By the same token, in Liparota v. United States,we considered a statute making it a crime to knowingly possess or use food stamps in an unauthorized manner. 471 U.S. 419, 420, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). The Government's argument, similar to its position in this case, was that a defendant's conviction could be upheld if he knowingly possessed or used the food stamps, and in fact his possession or use was unauthorized. Id.,at 423, 105 S.Ct. 2084. But this Court rejected that interpretation of the statute, because it would have criminalized "a broad range of apparently innocent conduct" and swept in individuals who had no knowledge of the facts that made their conduct blameworthy. Id.,at 426, 105 S.Ct. 2084. For example, the statute made it illegal to use food *2010 stamps at a store that charged higher prices to food stamp customers. Without a mental state requirement in the statute, an individual who unwittingly paid higher prices would be guilty under the Government's interpretation. Ibid. The Court noted that Congress couldhave intended to cover such a "broad range of conduct," but declined "to adopt such a sweeping interpretation" in the absence of a clear indication that Congress intended that result. Id.,at 427, 105 S.Ct. 2084. The Court instead construed the statute to require knowledge of the facts that made the use of the food stamps unauthorized. Id.,at 425, 105 S.Ct. 2084.
To take another example, in Posters 'N' Things, Ltd. v. United States,this Court interpreted a federal statute prohibiting the sale of drug paraphernalia. 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994). Whether the items in question qualified as drug paraphernalia was an objective question that did not depend on the defendant's state of mind. Id.,at 517-522, 114 S.Ct. 1747. But, we held, an individual could not be convicted of selling such paraphernalia unless he "knew that the items at issue [were] likely to be used with illegal drugs." Id.,at 524, 114 S.Ct. 1747. Such a showing was necessary to establish the defendant's culpable state of mind.
And again, in X-Citement Video,we considered a statute criminalizing the distribution of visual depictions of minors engaged in sexually explicit conduct. 513 U.S., at 68, 115 S.Ct. 464. We rejected a reading of the statute which would have required only that a defendant knowingly send the prohibited materials, regardless of whether he knew the age of the performers. Id.,at 68-69, 115 S.Ct. 464. We held instead that a defendant must also know that those depicted were minors, because that was "the crucial element separating legal innocence from wrongful conduct." Id.,at 73, 115 S.Ct. 464. See also Staples, 511 U.S., at 619, 114 S.Ct. 1793(defendant must know that his weapon had automatic firing capability to be convicted of possession of such a weapon).
When interpreting federal criminal statutes that are silent on the required mental state, we read into the statute "only that mens reawhich is necessary to separate wrongful conduct from 'otherwise innocent conduct.' " Carter v. United States,530 U.S. 255, 269, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)(quoting X-Citement Video, 513 U.S., at 72, 115 S.Ct. 464). In some cases, a general requirement that a defendant actknowingly is itself an adequate safeguard. For example, in Carter,we considered whether a conviction under 18 U.S.C. § 2113(a), for taking "by force and violence" items of value belonging to or in the care of a bank, requires that a defendant have the intent to steal. 530 U.S., at 261, 120 S.Ct. 2159. We held that once the Government proves the defendant forcibly took the money, "the concerns underlying the presumption in favor of scienter are fully satisfied, for a forceful taking-even by a defendant who takes under a good-faith claim of right-falls outside the realm of ... 'otherwise innocent' " conduct. Id.,at 269-270, 120 S.Ct. 2159. In other instances, however, requiring only that the defendant act knowingly "would fail to protect the innocent actor." Id.,at 269, 120 S.Ct. 2159. A statute similar to Section 2113(a)that did not require a forcible taking or the intent to steal "would run the risk of punishing seemingly innocent conduct in the case of a defendant who peaceably takes money believing it to be his." Ibid.In such a case, the Court explained, the statute "would need to be read to require ... that the defendant take the money with 'intent to steal or purloin.' " Ibid.
*2011 C
Section 875(c), as noted, requires proof that a communication was transmitted and that it contained a threat. The "presumption in favor of a scienter requirement should apply to eachof the statutory elements that criminalize otherwise innocent conduct." X-Citement Video,513 U.S., at 72, 115 S.Ct. 464(emphasis added). The parties agree that a defendant under Section 875(c)must know that he is transmitting a communication. But communicating something is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. Id.,at 73, 115 S.Ct. 464. The mental state requirement must therefore apply to the fact that the communication contains a threat.
Elonis's conviction, however, was premised solely on how his posts would be understood by a reasonable person. Such a "reasonable person" standard is a familiar feature of civil liability in tort law, but is inconsistent with "the conventional requirement for criminal conduct-awarenessof some wrongdoing." Staples,511 U.S., at 606-607, 114 S.Ct. 1793(quoting United States v. Dotterweich,320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943); emphasis added). Having liability turn on whether a "reasonable person" regards the communication as a threat-regardless of what the defendant thinks-"reduces culpability on the all-important element of the crime to negligence," Jeffries,692 F.3d, at 484(Sutton, J., dubitante), and we "have long been reluctant to infer that a negligence standard was intended in criminal statutes," Rogers v. United States,422 U.S. 35, 47, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975)(Marshall, J., concurring) (citing Morissette,342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288). See 1 C. Torcia, Wharton's Criminal Law § 27, pp. 171-172 (15th ed. 1993); Cochran v. United States,157 U.S. 286, 294, 15 S.Ct. 628, 39 L.Ed. 704 (1895)(defendant could face "liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind"). Under these principles, "what [Elonis] thinks" does matter. App. 286.
The Government is at pains to characterize its position as something other than a negligence standard, emphasizing that its approach would require proof that a defendant "comprehended [the] contents and context" of the communication. Brief for United States 29. The Government gives two examples of individuals who, in its view, would lack this necessary mental state-a "foreigner, ignorant of the English language," who would not know the meaning of the words at issue, or an individual mailing a sealed envelope without knowing its contents. Ibid. But the fact that the Government would require a defendant to actually know the words of and circumstances surrounding a communication does not amount to a rejection of negligence. Criminal negligence standards often incorporate "the circumstances known" to a defendant. ALI, Model Penal Code § 2.02(2)(d)(1985). See id.,Comment 4, at 241; 1 LaFave, Substantive Criminal Law § 5.4, at 372-373. Courts then ask, however, whether a reasonable person equipped with that knowledge, not the actual defendant, would have recognized the harmfulness of his conduct. That is precisely the Government's position here: Elonis can be convicted, the Government contends, if he himself knew the contents and context of his posts, and a reasonable person would have recognized that the posts would be read as genuine threats. That is a negligence standard.
In support of its position the Government relies most heavily on *2012 Hamling v. United States,418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). In that case, the Court rejected the argument that individuals could be convicted of mailing obscene material only if they knew the "legal status of the materials" distributed. Id.,at 121, 94 S.Ct. 2887. Absolving a defendant of liability because he lacked the knowledge that the materials were legally obscene "would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law." Id.,at 123, 94 S.Ct. 2887. It was instead enough for liability that "a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials." Ibid.
This holding does not help the Government. In fact, the Court in Hamlingapproved a state court's conclusion that requiring a defendant to know the character of the material incorporated a "vital element of scienter" so that "not innocent but calculated purveyance of filth ... is exorcised." Id.,at 122, 94 S.Ct. 2887(quoting Mishkin v. New York,383 U.S. 502, 510, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); internal quotation marks omitted). In this case, "calculated purveyance" of a threat would require that Elonis know the threatening nature of his communication. Put simply, the mental state requirement the Court approved in Hamlingturns on whether a defendant knew the character of what was sent, not simply its contents and context.
Contrary to the dissent's suggestion, see post,at 2019 - 2020, 2022 - 2023 (opinion of THOMAS, J.), nothing in Rosen v. United States,161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896), undermines this reading. The defendant's contention in Rosenwas that his indictment for mailing obscene material was invalid because it did not allege that he was aware of the contents of the mailing. Id.,at 31-33, 16 S.Ct. 434. That is not at issue here; there is no dispute that Elonis knew the words he communicated. The defendant also argued that he could not be convicted of mailing obscene material if he did not know that the material "could be properly or justly characterized as obscene." Id.,at 41, 16 S.Ct. 434. The Court correctly rejected this "ignorance of the law" defense; no such contention is at issue here. See supra,at 2009.
* * *
In light of the foregoing, Elonis's conviction cannot stand. The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state. That understanding "took deep and early root in American soil" and Congress left it intact here: Under Section 875(c), "wrongdoing must be conscious to be criminal." Morissette,342 U.S., at 252, 72 S.Ct. 240.
There is no dispute that the mental state requirement in Section 875(c)is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat. See Tr. of Oral Arg. 25, 56. In response to a question at oral argument, Elonis stated that a finding of recklessness would not be sufficient. See id.,at 8-9. Neither Elonis nor the Government has briefed or argued that point, and we accordingly decline to address it. See Department of Treasury, IRS v. FLRA,494 U.S. 922, 933, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990)(this Court is "poorly situated" to address an argument the Court of Appeals did not consider, the parties did not brief, and counsel addressed in "only the most cursory fashion at oral argument"). Given our disposition, it is not necessary to consider any First Amendment issues.
*2013 Both Justice ALITO and Justice THOMAS complain about our not deciding whether recklessness suffices for liability under Section 875(c). Post,at 2013 - 2014 (ALITO, J., concurring in part and dissenting in part); post, at 2018 - 2019 (opinion of THOMAS, J.). Justice ALITO contends that each party "argued" this issue, post, at 2014, but they did not address it at all until oral argument, and even then only briefly. See Tr. of Oral Arg. at 8, 38-39.
Justice ALITO also suggests that we have not clarified confusion in the lower courts. That is wrong. Our holding makes clear that negligence is not sufficient to support a conviction under Section 875(c), contrary to the view of nine Courts of Appeals. Pet. for Cert. 17. There was and is no circuit conflict over the question Justice ALITO and Justice THOMAS would have us decide-whether recklessness suffices for liability under Section 875(c). No Court of Appeals has even addressed that question. We think that is more than sufficient "justification," post, at 2014 (opinion of ALITO, J.), for us to decline to be the first appellate tribunal to do so.
Such prudence is nothing new. See United States v. Bailey,444 U.S. 394, 407, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)(declining to decide whether mental state of recklessness or negligence could suffice for criminal liability under 18 U.S.C. § 751, even though a "court may someday confront a case" presenting issue); Ginsberg v. New York,390 U.S. 629, 644-645, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)(rejecting defendant's challenge to obscenity law "makes it unnecessary for us to define further today 'what sort of mental element is requisite to a constitutionally permissible prosecution' "); Smith v. California,361 U.S. 147, 154, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959)(overturning conviction because lower court did not require any mental element under statute, but noting that "[w]e need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution"); cf. Gulf Oil Co. v. Bernard,452 U.S. 89, 103-104, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)(finding a lower court's order impermissible under the First Amendment but not deciding "what standards are mandated by the First Amendment in this kind of case").
We may be "capable of deciding the recklessness issue," post, at 2014 (opinion of ALITO, J.), but following our usual practice of awaiting a decision below and hearing from the parties would help ensure that we decide it correctly.
The judgment of the United States Court of Appeals for the Third Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
It is so ordered.