

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00196-CR
### NO. 02-13-00197-CR

DANIEL HERNANDEZ

APPELLANT

V.

THE STATE OF TEXAS

STATE

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NOS. F-2012-0920-E, F-2012-0923-E

----------

## DISSENTING OPINION

----------

Respectfully, I must dissent from the thoughtful majority opinion. The issue in this case is whether there must be evidence that the defendant intended to threaten injury to the specific person named in the charging instrument, the complainant, and knew that he had done so, or whether the threat may have arisen solely from the complainant's view of the circumstances and his

conclusions about the intent of the accused. The issue is not whether there is any way to construe Appellant's actions as threatening.

A person commits aggravated assault when he or she intentionally or knowingly threatens another with imminent bodily injury while using or exhibiting a deerly weapon.[1] Section 6.03 of the penal code defines culpable mental states:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[2]

The record is confusing at best. It appears that Complainant threw a portion of a metal towing hitch at the door of Appellant's pickup and then smashed out the pickup's back window because Appellant was "burning the tires" where several shoppers had gathered. Complainant testified,

Q.     The first time, he drove through and burned his tires?

A.     Yes, sir.

---

[1]Tex. Penal Code Ann. § 22.01(a)(2) (West Supp. 2014), § 22.02(a)(2) (West 2011); *Adkins v. State*, 274 S.W.3d 870, 874 (Tex. App.—Fort Worth 2008, no pet.).

[2]Tex. Penal Code Ann. § 6.03(a)–(b) (West 2011).

Q. Did you see him with a gun then?

A. No, sir.

. . . .

Q. Did you see him point a gun at anybody then?

A. On that first time, no, sir.

Q. Did you—he threaten you with shooting you or putting you down at that time?

A. No. On that occasion he leaves and exits and does the same thing.

. . . .

Q. And my question was not that, but my question is very simple. Did you—did you not tell this jury just a few minutes ago that [Appellant] never pointed a gun at you?

A. Me, he never pointed it.

Q. And he never threatened to kill you, did he?

A. I imagine he didn't. But if you go to my house and you see some shots down at my house, what can you think?

. . . .

Q. So when he comes back the second time, you approach the truck, you still didn't see a gun, did you?

A. On the second time, that's when he starts burning again.

Q. Did you—did you see a gun?

A. No, sir.

Q. Did you get threatened with a gun?

A. On the second time, no.

Q. Did he point a gun at you?

3

A.    No, sir.

Complainant's testimony was hard to follow. He testified,

Q.    (BY [Defense Counsel]) So the second time, when the burnout, you threw a trailer hitch at the truck in order to get him out of the truck to confront you; is that right?

A.    Not to confront him, but to stop him so that he would stop driving that vehicle.

Complainant also testified that when Appellant got out of his truck after the final time he "burned the tires," Complainant went up to Appellant and asked him what his problem was. Appellant responded, pointing at Complainant, "You're going down." The majority interprets the same record as Complainant's not throwing the hitch until the third time Appellant "burned his tires," but Appellant's threatening him the second time. Unfortunately, we do not know whether "You're going down" means "You're going to go to jail," "I'm going to knock you down," or "I'm going to kill you." The statement is ambiguous and was never explained.

The State concedes that Appellant never directly threatened Complainant with a firearm, but argues,

The evidence is sufficient to support a conviction of Aggravated Assault through transferred intent because Appellant pointed a firearm at Francisco San Miguel, who he thought was [Complainant]. The firearm alone could infer intent, but here intent could have been inferred from Appellant's words and conduct as well. Even if this Court does not find a transfer of intent, the evidence is still sufficient because Appellant pointed the firearm at everyone in the area. Since the victim was in the area, the firearm was therefore also pointed at him.

4

There are two problems with the State's argument. First, there is no evidence that Appellant thought Francisco San Miguel was Complainant. The nearest thing to evidence is Complainant's unfounded speculation:

Q. Did you ever see the Defendant with the gun?

A. From the inside of the building, and I kept my hands like this (indicating), holding the door down because I had my son that was coming. He was headed this way over here, like this (indicating). I was scared for my life because my son was also in there.

Q. But did you ever see the Defendant with the gun?

A. Yes. There's my truck, there's another vehicle, and then there's my friend. And he is pointing the pistol on my friend, but he thought he was me.

Q. And you saw this happen?

A. Yes, sir.

This speculation is the only thing that could be construed as evidence that Appellant thought he was pointing the gun at Complainant. Complainant also testified,

Q. All right. And going back to that night, did you ever see the Defendant get out of the truck?

A. No, because I was with a pregnant lady. I was doing something like getting inside the building. I thought he had left. And that's when my son comes in running, says that he got out of the vehicle, the truck was parked here, and that he had a—a pistol—the pistol. And he is putting it on the people here (indicating). And he walks this—over here, and that's where my friend was. And he puts the pistol on him. The lady was standing here, and I was in the building.

Q. What do you mean when you say he's putting it on people?

5

A. (Indicating) That he was pointing at them, like looking for me, okay, which one of you is Lupe? He's not asking, but that's what I think he was thinking, to see who it was.

As for the State's argument that by pointing the gun at the crowd, Appellant was pointing it at Complainant because he was in the crowd, the record is clear that Complainant was not in the crowd. He had taken refuge inside the building.

Q. Now, you testified to this jury that you saw him holding the gun?

A. Yes, as far as I could see. Because in the building—in the building, there's an entrance here (indicating), and there is a window here that you can—you can see from. And between this window and this door, there is nothing where you can see through.

Q. How did you feel when you saw him with the gun?

A. (Crying) I was scared that he could kill me and leave my family by itself.

There is, however, no evidence that Appellant knew that Complainant was watching him. There is no evidence of what Appellant intended to accomplish. There is no evidence of what Appellant was saying, if anything, while he was pointing the gun at the crowd.

My dissent is apparently inartfully drafted because the majority does not understand it, believing it to require corroboration of a complainant's testimony that he or she has been threatened by the accused. Perhaps the Supreme Court of the United States has explained my position more clearly than I: "[O]ur cases have explained that a defendant generally must 'know the facts that make his

6

conduct fit the definition of the offense . . . ."[3]  In this case, Appellant must have known that Complainant was present and that he was placing Complainant in fear of bodily injury to be imminently inflicted on him.  It is an essential element of the offense.[4]

In a puzzling conclusion, the majority states that "[t]he totality of the evidence shows Appellant was hunting [Complainant] with a gun and was verbally threatening to take him down . . . in the location Appellant expected to find him."[5]  There is no evidence, and the majority refers to none, that Appellant was "hunting [Complainant] with a gun."[6]  Nowhere in the record does Appellant threaten "to take [Complainant] down"[7] while holding a firearm.  As far as the peculiar statement that Appellant was making these fantasy threats "in the location Appellant expected to find [Complainant],"[8] nothing in the record supports this pronouncement.  Perhaps the majority misunderstands the record.

The location the majority speaks of is a parking lot.  This is not a huge Walmart parking lot.  It is a parking lot that appears large enough to handle

---

[3] *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citing *Staples v. United States*, 511 U. S. 600, 607 n.3, 114 S. Ct. 1793, 1798 n.3 (1994)).

[4] Tex. Penal Code Ann. §§ 22.01(a)(2), 22.02(a)(2).

[5] Maj. Op. at 11.

[6] *Id.*

[7] *Id.*

[8] *Id.*

twenty to twenty-five cars. The parking lot is a place people gathered to socialize, to buy corn, and to send packages to Mexico. It was full of people and cars and the place Appellant, for some reason, chose to "burn" his tires.

The majority makes much of the fact that Appellant was "in the location he expected to find" Complainant.[9] Nothing in the record tells us who or what Appellant expected to find, or whether, indeed, Appellant expected to find any specific person.

A building sits at each end of the parking lot, but only one is actually on the parking lot, the building that was the location of Complainant's corn business. Officer Acrey described the corn stand as a portable unit with a building behind it. Complainant described the building as "the business." The building is not a stand with an open counter. It is a building with a door and windows. Yet, the record mentions nothing about Appellant's going into Complainant's building, the logical place he would expect to find Complainant. There is no basis for the majority's speculation that Appellant expected to find Complainant out on the parking lot.

The majority then concludes that "[Complainant] was, in fact, there."[10] But Complainant was not out on the parking lot, which was the only place Appellant went, according to the record. Complainant was inside a building. The majority

---

[9]*Id.*

[10]*Id.*

8

says that "Appellant's inability to find [Complainant] in the crowd did not change Appellant's conduct."[11]  But there is no evidence in the record that Appellant was searching for Complainant.  The case law that the majority relies on goes not to the defendant's perception that the complainant feels threatened but only to the question of whether a complainant has been placed in fear when the defendant, unknown to the complainant, does a threatening act in preparation for assaulting the complainant.  That is not the circumstance before this court.  The majority's pronouncement that "[Complainant's] hiding, far from disproving the commission of the offense . . . proved its commission—it showed both the immediacy and the efficacy of the Appellant's threat"—[12] misses the point.

Nothing in the record suggests that Appellant was aware that Complainant was in a position to feel threatened or that Appellant had any intention of threatening Complainant.  We may speculate that such was his intent, but our law requires evidence of each element of the offense, not conviction based on mere speculation.  Appellant was pointing his gun at people on the parking lot, and in the direction of the corn business, but Complainant was not on the parking lot.  What was the immediacy of the threat?  How was Appellant to know he was placing Complainant in fear of immediate injury when there is no evidence that he knew Complainant was present?

---

[11] *Id.*

[12] *Id.*

It is possible that the shooting of Complainant's truck at his house could be considered a threatening message. The problem here, however, is the record. No one saw who did the shooting. Appellant did not take credit for the shooting. Although the shells collected from the truck were the same brand and caliber as those found at Appellant's home, there is no description of the gun that Appellant was carrying on the night in question. The majority concludes that Appellant did the shooting, but there is no evidence, more than mere speculation, that Appellant was the shooter.

Appellant was charged with and tried for a specific offense, aggravated assault of Complainant with a firearm. The State was required to prove the elements of that offense: that Appellant knowingly or intentionally threatened that person with a firearm. When asked if Appellant ever pointed the gun at him, Complainant answered, "No. Because when my son tells me that he has a pistol on him, I ran and I got inside the business." The two men had a history and a family connection such that the State argues that Appellant even knew where Complainant lived and recognized his pickup. Yet the State argues that, despite this history and family connection, Appellant could not tell the difference between Complainant and his friend San Miguel.

The evidence is clear that when Appellant returned to the parking lot where Complainant had dented Appellant's truck and broken out the window with the towing hitch, Complainant hid inside the building. Complainant speculated that Appellant mistook San Miguel for him, but there is no evidence of such a

10

mistake, and, other than Appellant's pointing the gun at someone else, no evidence of a threat of imminent harm to Complainant. Complainant also speculated that Appellant was asking the crowd where he was. If that speculation is evidence, it is evidence only that Appellant knew that Complainant was not present and, consequently, that he was not there for Appellant to threaten. Appellant could not believe, therefore, that he was threatening and placing Complainant in fear of death or serious bodily injury to be imminently inflicted.

I would hold the evidence insufficient to support Appellant's conviction for aggravated assault with a firearm. Because the majority does not, I must respectfully dissent.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: August 6, 2015

11