

# IN THE
# Court of Appeals of Indiana

Leah Moone,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Jan 29 2025, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

January 29, 2025

Court of Appeals Case No.
23A-CR-3050

Appeal from the Marion Superior Court

The Honorable Jennifer P. Harrison, Judge

Trial Court Cause No.
49D20-2302-F5-3317

**Opinion by Judge May**
Judges Brown and Pyle concur.

**May, Judge.**

[1]     Leah Moone appeals her convictions of Level 5 felony stalking[1] and Class A misdemeanor invasion of privacy.[2] She raises several issues for our review, which we consolidate and restate as:

1. Whether the State presented insufficient evidence to support Moone's Level 5 felony stalking conviction because:

    1.1    Moone's statements to R.M. were constitutionally protected speech; and

    1.2    she did not know her communications would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened; and

2. Whether the State presented insufficient evidence to support Moone's conviction of invasion of privacy.

We affirm.

## Facts and Procedural History

[2]     In August 2022, Moone began working with Helping Veterans and Families ("HVAF"), a "local nonprofit that serves veterans and families facing homelessness." (Tr. Vol. II at 74.) Moone began working at HVAF as an intern, and HVAF later hired her for a full-time position as a community center specialist. Early in her employment with HVAF, Moone met R.M., a program

---

[1] Ind. Code § 35-45-10-5(b)(3).

[2] Ind. Code § 35-46-1-15.1(a)(5).

coordinator at HVAF.  Moone and R.M. discussed Moone's education and "issues that [Moone] was having with coworkers[.]"  (*Id*. at 84.)

[3]     In early December 2022, Moone came to R.M.'s office and "verbally expressed" her romantic interest in him.  (*Id*.)  R.M. told Moone he was not interested in pursuing a romantic relationship with her because he preferred to "separate [his] personal and professional lives[.]"  (*Id*.)  Approximately twenty minutes later, Moone sent R.M. an email summarizing their conversation and "that the proverbial ball was in [his] court to make a decision if [he] wanted to pursue any kind of romantic relationship at that point."  (*Id*. at 85.)  R.M. did not initiate a romantic relationship with Moone and they continued to have a professional relationship.  At some point, R.M. gave Moone his personal email address "for [him] to be able to send links to things that would help her with her schooling" and "for her to kind of discuss some of the issues that she was having at work."  (*Id*. at 86.)

[4]     At some point during her employment at HVAF, Moone filed several grievances with human resources in which she alleged "[t]heft, discrimination, harm to veteran clientele, and veteran employees, as well as unsafe working conditions."  (*Id*. at 120.)  Moone saw herself as a "whistleblower[.]"  (*Id*.)  Moone and HVAF's CEO E.H. met with human resources, and Moone then withdrew her complaints.  In December 2022, Moone began having disagreements regarding programming with E.H. because E.H. would not allow Moone to conduct a research project regarding cultural competency at HVAF.  In late December, Moone was fired from HVAF because she "created a hostile

work environment with several colleagues." (*Id.* at 77.) After she was fired, Moone began sending emails[3] to R.M.[4]

[5] On January 19, 2023, under cause number 49D24-2301-F6-1754 ("F6-1754"), the State charged Moone with two counts of Level 6 felony intimidation and eight counts of Class A misdemeanor invasion of privacy based on alleged actions in early January against E.H. and R.M.[5] After those charges were filed, the trial court in F6-1754 issued a no contact order that prohibited Moone from having any contact with R.M. or E.H.

[6] On January 29, 2023, Moone sent thirty emails to R.M.'s personal email address. R.M. did not respond. These emails included links to pornographic videos, voice messages, video recordings, and nude pictures of Moone. In one email Moone stated, "[t]he prison door is open, and it's your choice when you want to walk out!" (Ex. Vol. I at 8.) Moone believed she could see the predictive text for an anticipated reply from R.M. in which R.M. stated "I'm going to see you soon" though no such reply materialized. (*Id.* at 15.) In another email Moone told R.M., "I can't stop because you don't let go of who you love. No matter how crazy we look or feel. . . . [w]e're stuck together. And no matter what I say, I'll never stop sending you letters from home." (Ex.

---

[3] The record does not contain copies of these emails.

[4] R.M. testified he never responded to any of Moone's emails, but it is unclear from the context of his testimony whether he was talking only about the emails that are the subject of the case appealed herein or also about all emails sent after Moone was fired from HVAF.

[5] The record does not disclose the alleged actions that prompted these charges.

Vol. II at 15.) Finally, Moone sent R.M. an email that said "I have mean weird thoughts with you. This was Monday. Good thing I didn't send [it] or I'd have been like WELP THIS IS WHY IM IN JAIL[.]" (*Id.* at 9) (errors and emphasis in original).

On January 30, 2023, and January 31, 2023, Moone sent thirty-four additional emails to R.M. These emails included sexually explicit language and links to pornographic websites. In one email, Moone stated: "I want to make you a dad. . . . I can't wait. No matter what we'll have kids together." (Ex. Vol. III at 7.) In another, she wrote: "Don't be scared. I'll never leave you." (Ex. Vol. IV at 4.) On February 2, 2023, Moone posted a message on social media website LinkedIn that stated: "No matter how bad things become, or how lost, sick, or wounded a woman is, a man never leaves her. Not if he loves her. [R.M.] will never leave me. He loves me. He'll lie, cheat, give false testimony, kill or die for her." (*Id.* at 15.)

After the email about what Moone believed was R.M.'s predictive text saying he would see her soon,[6] R.M. became "very, very worried and concerned [about] when [Moone might try to visit him], where that would occur, things like that." (Tr. Vol. II at 89.) Regarding the email about Moone having thoughts about doing something that would cause her to go to jail, R.M. was

[6] Moone also believed R.M. was an FBI agent who was surreptitiously communicating with her about an investigation he was allegedly engaged in to expose corruption at HVAF. R.M. testified he was not an FBI agent.

frightened about "whatever this mean weird thought would be." (*Id*.) After Moone sent an email with an audio recording of a sexual nature, R.M. felt "intimidated" because he "[didn't] know what length somebody would go when they have obsessive thoughts like that[.]" (*Id*. at 90-1.) Moone's emails made R.M. feel "[c]oncerned, worried, intimidated, . . . [and] terrorized simply because of the nature of what – it's the persistent obsessive behaviors and actions when there was no response from me." (*Id*. at 96.) R.M. was "really concerned about where this can go . . . [i]f a court order isn't good enough, I don't know what is at this point." (*Id*. at 96.) Moone started "looking over [his] shoulder more so than normal" and wearing a wedding ring despite not being married. (*Id*.) He considered installing a home security system and called the police to his home multiple times because of security concerns.

[9] From January 29, 2023, to February 3, 2023, E.H., who as CEO had access to HVAF's LinkedIn account, received notifications that Moone had tagged HVAF in several posts on LinkedIn. Some of those posts mentioned E.H. by name. One post stated "[HVAF] disrespected my family legacy. So it was my job to tear theirs apart. Time to go to [E.H.'s] pancake house and continue the carnage. I'd love to do some research and see just how shitty [E.H.'s] lineage is." (Ex. Vol. IV at 22) (original formatting omitted). On February 3, 2023, Moone tagged HVAF on the following post placed on LinkedIn:

> I chose to stay at HVAF – Helping Veterans and Families despite
> the toxic environment because I knew there were many people
> who had suffered, and if they fired me they would end up

hanging themselves – they were all too eager to use my #disabilities to try and force me out.

The company receives public money, grant money, and the higher ups embezzle that money and take donations as well as mismanage it horribly. Running was not and is not an option for me. If you care about something, fight for it, no matter how many people tell you to stop. This applies to anything in your life, including people. :)

#whistleblowing #whistleblower

[E.H. and other HVAF employees] all engaged in highly illegal practices to try and force me to quit. I refused. The end result? They fired me and put me in the perfect position to ruin them. Just like they tried to do to me.

Checkmate. Motherfuckers.

(*Id*. at 24) (links omitted). Later that day, Moone also posted on LinkedIn, "Facing my fears. Time to fuck Chip and [E.H.]. You picked the right bitch." (*Id*. at 25.)

[10] On February 3, 2023, the State charged Moone with one count of Level 5 felony stalking of R.M., five counts of Class A misdemeanor invasion of privacy against R.M., and three counts of Class A misdemeanor invasion of privacy against E.H. The charges of invasion of privacy alleged violations of the no contact orders issued as part of F6-1754 and the stalking charge was elevated to a Level 5 felony for the same reason.

The trial court held the first part of Moone's jury trial on October 27, 2023, and the second part on November 8, 2023. On November 13, 2023, the trial court entered a detailed order outlining the specific evidence that would support convictions of one count of Level 5 felony stalking of R.M., four counts of invasion of privacy against R.M., and two counts of invasion of privacy against E.H. However, because of double jeopardy concerns, the trial court entered convictions of only one count of Level 5 felony stalking of R.M. and one count of invasion of privacy against E.H. The trial court sentenced Moone to 1,460 days for stalking and 180 days for invasion of privacy, and it ordered the sentences served consecutively for an aggregate sentence of 1,640 days. The court also suspended 365 days of Moone's sentence for stalking.

## Discussion and Decision

Moone asserts the State did not present sufficient evidence to support her convictions. When faced with challenges to the sufficiency of evidence, we apply a "well settled" standard of review that leaves determination of the weight of the evidence and credibility of the witnesses to the fact-finder. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024). "We consider only the evidence most favorable to the trial court's ruling and will affirm a defendant's conviction unless 'no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.'" *Id.* (quoting *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000)). A defendant's intent can be determined from circumstantial evidence. *Phipps v. State*, 90 N.E.3d 1190, 1195 (Ind. 2018).

## 1. Stalking

[13] Moone asserts the State did not present sufficient evidence that she committed Level 5 felony stalking of R.M. because (1) her statements were not true threats and thus were constitutionally protected, and (2) she did not know that they would make R.M. feel terrorized, threatened, frightened, or intimidated. Pursuant to Indiana Code section 35-45-10-5(a), "a person who stalks another person commits stalking, a Level 6 felony." [7] "Stalk" is defined as

> a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened. The term does not include statutorily or constitutionally protected activity.

Ind. Code § 35-45-10-1. "Harassment" is defined as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Ind. Code § 35-45-10-2. "Impermissible contact" includes, but is not limited to: "(1) Following or pursuing the victim. (2) Communicating with the victim. (3) Posting on social media, if the post: (A) is directed to the victim; or (B) refers to the victim,

---

[7] The crime is elevated to a Level 5 felony if the person does so in violation of "an order issued as a condition of pretrial release, including release on bail or personal recognizance, or pretrial diversion if the person has been given actual notice of the order." Ind. Code § 35-45-10-5(b)(3). Moone does not dispute she had knowledge of the order prohibiting her from contacting R.M.

directly or indirectly." A person does something knowingly when she "engages in the conduct . . . [and] is aware of a high probability [s]he is doing so." Ind. Code § 35-41-2-2(b).

### 1.1. Constitutionally Protected Speech

[14] Moone argues her communications to R.M. are protected by the First Amendment and she thus cannot be convicted of crimes based on those communications. Despite our deferential standard of review in assessing the sufficiency of the evidence on appeal, when "constitutional protection for Defendant's speech hinges on state-of-mind issues," such deferential review "creates an unacceptable risk of under-protecting speech." *Brewington v. State*, 7 N.E.3d 946, 955 (Ind. 2014), *reh'g denied*, *cert. denied*, 574 U.S. 1077 (2015), *reh'g denied*. "It is our constitutional duty, then, to 'make an independent examination of the whole record, so as to assure ourselves that the [conviction] does not constitute a forbidden intrusion on the field of free expression.'" *Id.* (quoting *Journal-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 455 (Ind. 1999), *cert. denied*, 528 U.S. 1005 (1999)) (brackets in *Brewington*). We cannot delegate this duty to the finder of fact and must independently review the record de novo. *Id.* However, in accordance with our deferential standard of review toward the fact-finder's factual determinations, we credit the version of facts consistent with the verdict in instances where Moone and the State presented contradictory accounts of what factually occurred. *See id.*

[15] The First Amendment does not absolutely protect all categories of speech and means of expression. *State v. Katz*, 179 N.E.3d 431, 452-53 (Ind. 2022). For

example, the First Amendment does not protect speech that constitutes a true threat. *McGuire v. State*, 132 N.E.3d 438, 444 (Ind. Ct. App. 2019), *trans. denied*. The United States Supreme Court recently reexamined the test to determine whether something is a true threat:

> "True threats" of violence is another historically unprotected category of communications. *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L.Ed.2d 535 (2003); see *United States v. Alvarez*, 567 U.S. 709, 717-718, 132 S. Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion). The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Black*, 538 U.S. at 359, 123 S. Ct. 1536. Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. *See Elonis v. United States*, 575 U.S. 723, 733, 135 S. Ct. 2001, 192 L.Ed.2d 1 (2015). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. *Ibid*. When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of violence" and to the many kinds of "disruption that fear engenders." *Black*, 538 U.S. at 360, 123 S. Ct. 1536 (internal quotation marks omitted).

*Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

[16] Prior to *Counterman*, a court had to determine whether a true threat occurred by analyzing whether "the speaker intend[ed] his communications to put his targets in fear for their safety[.]" *Ellis v. State*, 194 N.E.3d 1205, 1217 (Ind. Ct. App. 2022) (quoting *McGuire*, 132 N.E.3d at 444), *trans. denied*. However, *Counterman* lowered the mens rea for determining whether a statement was a true threat that is unprotected by the First Amendment:

> A person acts recklessly, in the most common formulation, when he "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." *Voisine v. United States*, 579 U.S. 686, 691, 136 S. Ct. 2272, 195 L.Ed.2d 736 (2016) (internal quotation marks omitted). That standard involves insufficient concern with risk, rather than awareness of impending harm. *See Borden v. United States*, 593 U. S. ——, ——, 141 S. Ct. 1817, 1823–1824, 210 L.Ed.2d 63 (2021) (plurality opinion). But still, recklessness is morally culpable conduct, involving a "deliberate decision to endanger another." *Voisine*, 579 U.S. at 694, 136 S. Ct. 2272. In the threats context, it means that a speaker is aware "that others could regard his statements as" threatening violence and "delivers them anyway." *Elonis*, 575 U.S. at 746, 135 S. Ct. 2001 (ALITO, J., concurring in part and dissenting in part).

*Counterman*, 600 U.S. at 79 (emphasis in original). Thus, prior to *Counterman*, a statement was a true threat when the speaker intended to put the target in fear. Now, under *Counterman*, a statement is a true threat if the speaker consciously disregards that the communication could put the target in fear.

[17] Here, Moone argues her communications were not true threats because she never threatened violence and did not intend to hurt R.M. She contrasts her

actions with those found in *Ellis,* 194 N.E.3d at 1211, and *McGuire*, 132 N.E.3d at 441. However, *Ellis* and *McGuire* were decided under the old standard for determining whether statements were a true threat. Thus, they are inapposite.

[18] Here, Moone engaged in an intense four-day deluge of emails and communications to R.M. in which she told him she would "make [him] a dad . . . [and] [n]o matter what we'll have kids together[,]" (Ex. Vol. III at 7), and that she was having "mean weird thoughts" about him and if she sent them she would be in jail. (Ex. Vol. II at 15.) In two others she told R.M., "[d]on't be afraid or anything," (*id*. at 7), and "[d]on't be scared. I'll never leave you." (Ex. Vol. IV at 4.) R.M. testified these statements made him concerned, frightened, and threatened. They caused him to change his routine, wear a wedding ring despite not being married, and pursue the purchase of a security system. Moone's communications used language suggesting she might physically harm R.M. or force him to do something with disregard for whether he would feel scared or threatened by the statements. In fact, these statements would cause a reasonable person to feel afraid because they suggest Moone might commit an act by force or resort to physical violence to ensure she was able to engage in a romantic relationship with R.M. Therefore, we conclude Moone's communications to R.M. were true threats not protected by the First Amendment. *See*, *e.g*., *Counterman*, 600 U.S. at 82 (Counterman's statements to C.W., while innocuous at first, proceeded into true threats under the reckless mens rea standard when he expressed anger toward C.W. in some of his messages and Counterman's messages made C.W. feel threatened).

## 1.2. Sufficiency of the Evidence – Stalking

[19] Moone next contends the State did not present evidence that she was "aware of the high probability that her messages would cause anyone to feel terrorized, threatened, frightened, or intimidated, least of all [R.M.]" because the messages were a "profession of love" and she "believed that [R.M.] was receiving the messages, discreetly responding to her, covertly assisting her in a mission, and that the no contact order between them was a ruse in furtherance of their mission to expose HVAF's wrongdoings." (Br. of Appellant at 36.) Because of her beliefs regarding the nature of her communications with R.M. and what she perceived as R.M.'s covert responses, Moone contends she did not know R.M. would feel terrorized, frightened, intimidated, or threatened. Moone does not challenge whether R.M. felt frightened or intimidated, only whether the State proved she knew her actions would make him feel that way.

[20] The State presented evidence Moone sent R.M. over fifty emails in three days. These emails included sexually explicit language, audio files, and photographs despite the fact that R.M. told Moone he was not interested in pursuing a romantic relationship with her. In those messages, Moone told R.M. she was having "mean weird thoughts" about him and if she had sent those thoughts to him she would have been put in jail. (Ex. Vol. II at 15.) In another she told R.M. that she wanted to "make [him] a dad . . . [and] [n]o matter what we'll have kids together." (Ex. Vol. III at 7.) In another, she stated, "[d]on't be scared. I'll never leave you." (Ex. Vol. IV at 4.) In a LinkedIn post, Moone

referenced R.M. by name and said he would "never leave [her]" and would "lie, cheat, give false testimony, kill or die for her." (*Id*. at 15.)

[21] Moone's characterization of her intent, including suggestions that she was in the midst of a mental health crisis at the time, is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Teising*, 226 N.E.3d at 783 (appellate court cannot reweigh evidence or judge the credibility of witnesses). A reasonable trier of fact could conclude from all this evidence that Moone knew that the content and frequency of her messages – especially after R.M. had told her that he was not interested in a romantic relationship – would have caused a reasonable person to feel frightened. Therefore, we conclude the State presented sufficient evidence Moone committed Level 5 felony stalking of R.M.[8] *See*, *e.g.*, *Ellis*, 194 N.E.3d at 1219 (Ellis committed stalking when she engaged in a pattern of harassment causing the victim to feel frightened).

---

[8] Moone also argues the State did not present sufficient evidence that she committed Class A misdemeanor invasion of privacy regarding R.M. However, the trial court did not enter judgment of conviction on those counts because of double jeopardy concerns. On appeal, Moone contends we should still consider the sufficiency of the evidence for the invasion of privacy counts because should we decide there was insufficient evidence to convict her of Level 5 felony stalking, the invasion of privacy counts were lesser-included offenses. However, we have concluded the State presented sufficient evidence to prove she committed Level 5 felony stalking and we therefore need not address those counts. *See, e.g., Shepherd v. State*, 157 N.E.3d 1209, 1221 (Ind. Ct. App. 2020) (when trial court vacates a conviction, argument regarding that vacated conviction is moot because this court cannot render the defendant any relief), *trans. denied*.

Relatedly, Moone argues her convictions of Level 5 felony stalking of R.M. and Class A misdemeanor invasion of privacy as to R.M. violated double jeopardy. However, as noted above, the trial court did not enter convictions of Class A misdemeanor invasion of privacy as to R.M., and double jeopardy therefore could not have occurred. *See Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006) ("[A] merged offense for which a defendant is found guilty, but on which there is neither a judgment nor a sentence, is 'unproblematic' as far as double jeopardy is concerned.") (quoting *Carter v. State*, 750 N.E.2d 778, 781 (Ind. 2001)).

### 3. Invasion of Privacy as to E.H.

[22] Moone argues the State did not present sufficient evidence that she committed Class A misdemeanor invasion of privacy against E.H. A person commits Class A misdemeanor invasion of privacy when she "knowingly or intentionally violates . . . a no contact order issued as a condition of pretrial release, including release on bail or personal recognizance, or pretrial diversion[.]" Ind. Code § 35-46-1-15.1(a)(5). Specifically, Moone contends that she did not tag E.H. in any of the LinkedIn posts the State introduced to prove violation of the no contact order.

[23] The no contact order entered as part of F6-1754 prohibited Moone from contacting E.H. "in person, by telephone or letter, through an intermediary, or in any other way, directly or indirectly." (Ex. Vol. I at 6.) From January 29, 2023, to February 3, 2023, E.H., who was the CEO of HVAF and had access to its LinkedIn account, received notifications on LinkedIn that Moone had tagged HVAF in several posts. E.H. testified that in some of the LinkedIn posts Moone said "she was going to tear [the protective order] up and feed it to her dog" and that "she knew she was violating [the protective order] but it didn't matter because nothing was going to happen to her." (Tr. Vol. II at 22.)

[24] In addition, some of those posts mentioned E.H. by name. One post stated: "Time to go to [E.H.'s] pancake house and continue the carnage. I'd love to do some research and see just how shitty [E.H.'s] lineage is." (Ex. Vol. IV at 22.) Another said: "Facing my fears. Time to fuck Chip and [E.H.]. You picked the right bitch." (*Id.* at 25) (original formatting omitted). Finally, in a video

posted to LinkedIn, Moone stated, "I'm being exposed gently to [E.H.]. But actually, I'm totally fine. I want to see her view my page, like yeah you lookin'?" (State's Ex. 74 at 5:50 – 5:59.)

[25] Moone asserts she did not know that E.H. had access to HVAF's LinkedIn page or would see the posts. However, her characterization of the evidence contradicts the plain language of her posts and is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Teising*, 226 N.E.3d at 783 (appellate court cannot reweigh evidence or judge the credibility of witnesses). A reasonable trier of fact could infer that Moone knew E.H. had access to HVAC's LinkedIn page and would see her disparaging comments. Therefore, we conclude the State presented sufficient evidence Moone committed Class A misdemeanor invasion of privacy as to E.H. *See, e.g.*, *Phipps*, 90 N.E.3d at 1196 (there was ample circumstantial evidence that Phipps knew she would be communicating indirectly to the victim when she sent an email to a third party closely associated with the victim).

## Conclusion

[26] Moone's communications with R.M. were true threats and thus not protected by the First Amendment to the United States Constitution. Additionally, the State presented sufficient evidence Moone committed Level 5 felony stalking of R.M. and Class A misdemeanor invasion of privacy against E.H. Accordingly, we affirm.

[27] Affirmed.

Brown, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Matthew Anglemeyer
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

Madison Crawford
Certified Legal Intern
Indianapolis, Indiana

Elvis Rivera Salinas
Certified Legal Intern
Indianapolis, Indiana