# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist ROBERT S. AVERY**
**United States Army, Appellant**

ARMY 20140202

Headquarters, 8th Army
Timothy P. Hayes, Jr. and Craig S. Denney, Military Judges
Colonel Marian Amrein, Staff Judge Advocate (Pre-trial)
Colonel Craig A. Meredith, Staff Judge Advocate (Post-trial)

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA; Major Christopher D. Coleman, JA; Captain Cody Cheek, JA (on brief); Colonel Mary J. Bradley, JA; Major Christopher D. Coleman, JA; Captain Cody Cheek, JA (on reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Melissa Dasgupta Smith, JA; Captain Christopher A. Clausen, JA (on brief).

30 November 2017

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

MULLIGAN, Senior Judge:

In this case, we address three assignments of error raised by appellant.[1] First, we explore whether the military judge erred in failing to grant defense counsel's challenge for cause of several members based upon an inelastic attitude towards sentencing. Second, we discuss whether the military judge properly instructed the members concerning the *mens rea* for the offense of indecent language. Finally, we consider whether the government's dilatory post-trial processing in this case warrants relief. In the end, we affirm the findings but set aside the sentence.

---

[1] Appellant's fourth assignment of error was rendered moot. After due consideration, we find the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), lack merit.

An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault of a child and one specification of communicating indecent language to a child under the age of sixteen, in violation of Articles 120b and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 920b and 934 (2012). The court sentenced appellant to a bad-conduct discharge and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

## BACKGROUND

Appellant, at all times relevant to the charges in this case, was a twenty-three-year-old married soldier with three children serving an accompanied tour in Yongsan, Korea. On various occasions, appellant enlisted the services of HK, the twelve-year-old stepdaughter of Sergeant (SGT) GH, to babysit his children. Appellant and HK eventually developed a mutual infatuation for each other.

The relationship progressed to the point appellant and HK frequently exchanged Facebook messages and met up clandestinely to engage in "make out" sessions that included kissing. The Facebook messages included one session wherein appellant and HK engaged in a name-calling duel. During this session, appellant called the twelve year-old girl a "cum guzzling gutter slut," which is the basis for the indecent language charge.

At some point, HK's stepfather discovered the Facebook exchanges between appellant and HK, which, in turn, led to the charges for which appellant was tried and convicted.

Additional facts pertinent to the resolution of this case are set forth below.

## LAW AND DISCUSSION

### A. Challenges for Cause

Appellant argues that the military judge abused his discretion in denying defense counsel's challenge for cause of four members who had expressed an inelastic predisposition towards sentencing. As a remedy, appellant asks this court to set aside his sentence.

During group voir dire, after the panel read the charges and specifications, the military judge asked the panel of ten members whether they "would be compelled to vote for a particular punishment, if the accused [was] found guilty, solely because of the nature of the charges?" The members answered in the negative. Later, the military judge ascertained that all of the members were aware of comments by the President regarding the need for vigorous prosecution of sexual assault, and of comments by senior civilian and military leaders on the issues of sexual assault.

Again, the members indicated they did not feel compelled to vote for a particular sentence based upon any of the comments they had heard and could remain impartial in hearing appellant's case.

Later, again during group voir dire, all ten members answered in the affirmative when asked by defense counsel "[d]o you believe that anyone convicted of a sexually-based offense must be discharged from the military?" The military judge immediately intervened and engaged in the following colloquy with the panel:

> MJ: [. . .] Members, that last question that was asked to you about, does anyone believe that if you're convicted of a sexually-based offense, must be discharged, you understand in this case that as you as panel members must individually decide what punishment, if any, including no punishment, is appropriate, if the accused is convicted of any offense.
>
> Do you understand that?
>
> [The members indicated an affirmative response.]
>
> MJ: Affirmative response. Understand that you are not required by law to impose any type of punishment, such as a discharge, if the accused is found guilty of any offense.
>
> Do you understand that?
>
> [The members indicated an affirmative response.]
>
> MJ: Do you agree that you will follow that instruction?
>
> [The members indicated an affirmative response.]
>
> MJ: [. . . ] And do all of the members agree that if, in fact, the accused is found guilty of one or more offenses, including sexual assault, that you will not have a predisposed sentencing determination that he must be discharged from the service?
>
> [The members indicated an affirmative response.]

Following group voir dire, the members were individually recalled to answer additional questions from the military judge and counsel. Upon recalling each member, the military judge started with an instruction that the member had to keep an open mind if called to sentence appellant for any offense and to consider the full

3

range of punishments. Each member indicated they understood and would follow the military judge's instructions.

Defense counsel had the following exchange with Master Sergeant (MSG) DR during individual voir dire:

> Q. Now, you also stated that should someone be convicted of a sexually-based offense they should be discharged; what did you mean by that?
>
> A. Sir, if you are convicted, I feel that you should be discharged. If you are convicted for sexual assault or sexually-based offenses, you should be discharged from the military.
>
> Q. Regardless of the level of offense from a grab all the way up to penetration, rape?
>
> A. I think there is difference -- my understanding is assault, I'm thinking physical, you know, penetration type versus may be a ground may not be grounds for discharge.
>
> Q. And in reviewing the flyer in this case, should Specialist Avery be convicted of those offenses do you believe that he would have to be discharged?
>
> A. Yes, sir.

After the military judge, yet again, explained that MSG DR had to follow his instructions to consider all possible punishments and that no particular punishment was required regardless of the findings. Master Sergeant DR indicated that he understood and could follow the instruction.

Defense counsel had the following exchange with Captain (CPT) FD during individual voir dire:

> Q. Now, the judge also spoke about the comments by the [P]resident and senior military leaders, you are aware of the President's philosophy that if you are convicted of a sexually-based offense then you must be discharged?
>
> A. Yes.
>
> Q. Do you subscribe to that philosophy as well?

A. Yes, but for the purpose of the courtroom -- I'll just follow the instructions.

Q. So, outside the courtroom you believe that but inside you have a different opinion?

A. Yes.

Q. How do you separate those two?

A. Well, here I have to be fair and impartial, so to be honest I have not seen the President make that comment, I just only heard it on the news, but I've seen higher leaders and -- and Secretary of Defense making those comments about sexual assault.

Q. And do you believe that that is, in fact, you did answer in the affirmative, correct that -- so, having seen the charge sheet in this case, should Specialist Avery be convicted of any of those offenses, do you believe that he must be discharged?

A. Yes because it's -- it's not -- it's not in line with the Army Values.

Upon further questioning by the military judge, CPT FD stated that he would consider this case on its individual facts and consider the full range of potential punishments.

Defense counsel had the following exchange with MSG RS during individual voir dire:

Q. Now, you are aware of the President's statement that if you are convicted with a sexual assault, you must be discharged, correct?

A. Yes, sir.

Q. Now, do you subscribe to that philosophy that the President has set forth?

A. I do believe, if convicted, it should be considered, yes.

Q. Should be considered. Now, in this case -- having seen the flyer, if Specialist Avery is convicted of any of those

offenses, do you believe that he must be discharged?

A. If he is convicted of sexual assault against a minor, yes, sir. I do believe so.

Q. So, you believe he must be discharge [sic]?

A. He should be, yes.

Upon further questioning by the military judge, MSG RS stated that he understood that he had to consider this case on its individual facts, would consider the full range of potential punishments, and could keep an open mind.

When questioning Sergeant First Class (SFC) JM, defense counsel asked whether SFC JM thought the accused should be separated if convicted of any of the offenses. Sergeant First Class JM answered in the affirmative.

Q. Now, you stated that you have heard the comments of the [P]resident that, if you are convicted of a sexual assault, you must be separated from the military?

A. Must be?

Q. Roger. Now, you did answer in the affirmative, though, that if someone is convicted, you believe that they must be separated, correct?

A. No, sir. Not must be, can be, if they're convicted, not if there're accused.

Q. What if they're convicted? Must -- should they be separated?

A. I believe so, yes, sir.

Q. Can you expand on that; why do you believe that?

A. Clearly if they're convicted, beyond reasonable doubt, that's not what the Army -- Values are in place for. Their mindset is in a different spot, not in the military.

Q. And having looked at the flyer in this case, if Specialist Avery were convicted of any of those offenses, do you believe that he must be separated?

6

A. Convicted, yes, sir.

As with the other members, the military judge then questioned SFC JM about whether he understood that he had to consider this case on its individual facts and consider the full range of potential punishments. Again, SFC JM responded that he understood and would follow the military judge's instructions.

Following voir dire, defense counsel challenged several members, to include, CPT FD, MSG RS, MSG DR, and SFC JM for cause. In ruling on the first of the challenges, the military judge described his framework for assessing the challenges, and stated on the record the proper tests for actual and implied bias, as well as the liberal grant mandate.

As to each of the four members at issue in this case, defense counsel articulated as a basis for challenge, among other reasons, the responses during voir dire that a person convicted of sexual assault should be discharged. In denying the challenges based upon actual and implied bias, the military judge determined that each member, based upon that member's responses, did not have an inelastic disposition as to sentence and could follow the court's instructions as to sentencing. All four of these members, along with four other members who survived challenges, heard appellant's case.

An "accused is entitled to have his case heard by members who are not predisposed or committed to a particular punishment, or who do not possess an inelastic attitude toward the punitive outcome." *United States v. Martinez*, 67 M.J. 59, 61 (C.A.A.F. 2008) (citations omitted). Rule for Courts-Martial [R.C.M.] 912(f)(1)(N) requires a panel member be excused when it is "in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." "This rule encompasses challenges based upon both actual and implied bias." *United States v. Elfayoumi*, 66 M.J. 354, 356 (C.A.A.F. 2008) (quoting *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007)). When assessing challenges for cause, a military judge must apply the "liberal grant mandate" and "err on the side of granting a challenge." *United States v. Peters*, 74 M.J. 31, 34 (C.A.A.F. 2015) (citation omitted). That is, "in close cases military judges are enjoined to liberally grant challenges for cause." *Id.* (quoting *Clay*, 64 M.J. at 277).

The issue before us is whether the military judge's rehabilitative efforts overcame the perception that the panel was free from the influence of an inelastic predisposition to impose a punitive discharge. That is, did the military judge abuse his discretion in denying appellant's challenge of these four members on the basis of implied bias?

Implied bias is an "objective test" based on "the consideration of the public's perception in having a particular member as part of the court-martial panel." *Peters*, 74 M.J. at 34 (citations omitted). In applying this objective test, we determine

"'whether the risk that the public will perceive that the accused received something less than a court of fair, impartial members is too high.'" *United States v. Bagstad*, 68 M.J. 460, 462 (C.A.A.F. 2010) (quoting *United States v. Townsend*, 65 M.J. 460, 463 (C.A.A.F. 2008)).

"This [c]ourt's standard of review on a challenge for cause premised on implied bias is less deferential than abuse of discretion, but more deferential than de novo review." *Bagstad*, 68 M.J. at 462 (citations omitted) (internal quotation marks omitted). Under this standard, "[w]e do not expect record dissertations but, rather, a clear signal that the military judge applied the right law." *United States v. Downing*, 56 M.J. 419, 422 (C.A.A.F. 2002). "In short, we review an implied bias challenge for cause on a sliding scale of deference that depends on how thoroughly the military judge placed his findings on the record." *United States v. Mayo*, 2017 CCA LEXIS 239, *9 (Army Ct. Crim. App. 16 Jun. 2017). However, "[i]ncantation of the legal test without analysis is rarely sufficient in a close case." *Peters*, 74 M.J. at 34.

Appellant cites to *Martinez* as an instance where our superior court found a military judge's rehabilitative attempts were insufficient to overcome an implied bias created by a member's inelastic attitude towards sentencing. 67 M.J. at 60-61. There, a panel member in a drug case indicated he could not consider no punishment as an option on sentencing. In response, the military judge, as here, obtained assurances from the member that he could consider the evidence and the possibility of a sentence of no punishment. The Court of Appeals for the Armed Forces (CAAF) found these rehabilitative measures fell short. *Id.* at 61. The Court noted the member in question provided qualified, if not hesitant answers despite repeated opportunities to disavow an inelastic attitude towards punishment. *Id.* More importantly, the military judge, in denying the challenge for cause, did not indicate if he had considered the issue of implied bias. *Id.*

Factually, we can distinguish *Martinez* from the present case in two respects. First, the member in *Martinez* demonstrated a far more inelastic attitude towards sentencing than each of the members in this case. Here, the members did not provide hesitant or qualified answers to the military judge; rather, each member, after indicating they believed that a soldier should be discharged if convicted of sexual assault, clearly conveyed their understanding of and willingness to follow the military judge's instructions to keep an open mind and consider the full range of punishments if the appellant was convicted. Second, the military judge here explicitly said he considered the issue of implied bias in denying the challenges for cause. On an individual basis, each member, in our view, sufficiently demonstrated he did not have an inelastic attitude towards a discharge once informed of the proper standards under which to adjudicate a sentence.

If only one of these members had answered defense counsel's question in the affirmative, we would find the military judge's rehabilitative efforts sufficient to sustain the denial of the challenge for cause under an implied bias standard.

However, we do not view each member's response in this case, or the military judge's denial of the challenge for cause as to each member, in a vacuum; we look to the totality of the circumstances. "In reaching a determination of whether there is implied bias, namely, a 'perception or appearance of fairness of the military justice system,' the totality of the circumstances should be considered." *Peters*, 74 M.J. at 34 (quoting *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995)). When four members repeat their belief that a conviction for sexual assault should result in a discharge, even after being instructed twice to keep an open mind, the perception created is that of a panel—or at least half of the panel ultimately seated—with an unwavering attitude that a discharge, despite the judge's instructions, was a foregone conclusion if appellant was convicted. The military judge did not adequately address the cumulative impact on the perceived fairness of appellant's panel by having all four of these members sit. For that reason, we find the military judge abused his discretion in denying appellant's challenges for cause.[2]

The issue of members with an apparent inelastic attitude towards a sentence, however, does not warrant us to set aside the findings in this case. Nothing in the record indicates any of these members had an actual or implied bias that called into their question their ability to fairly and impartially hear the case on findings. Accordingly, we grant appellant's request on this issue and set aside the sentence.

### B. Indecent Language and Mens Rea

Prior to closing argument, the military judge discussed instructions with counsel for both sides and, subsequently, provided counsel the written instructions for their review. Both the government and defense counsel indicated on the record, that they had no objections to the instructions. Later, the military judge provided the following instruction concerning indecent language to the members:

> "Indecent language" offense, in The Specification of Charge II the accused is charged with one specification of the offense of indecent language, a violation of Article 134 of the Uniform Code of Military Justice. To find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements:
>
> First, that between on or about 1 September 2012, and on or about 28 February 2013, at or near Hannam Village, Republic of Korea, the accused in writing communicated with Ms. [HK] a child under the age of 16 years certain language to wit: "cum guzzling gutter slut";

---

[2] As a result, we need not address the issue of actual bias.

Second, that language was indecent; and

Third, that under the circumstances the conduct of the accused was of a nature to bring discredit upon the armed forces.

"Words communicated to" means that the language is actually made known to the person to whom it was directed.

"Indecent language" that which is grossly offensive to the community sense of modesty, decency, or propriety, or shocks the moral sense of the community because of its vulgar, filthy, or disgusting nature. Language is also indecent if it is grossly offensive to the community sense of modesty, decency, and propriety, or shocks the moral sense of the community because of its tendency to incite lustful thought. Language is therefore indecent if it tends to reasonably corrupt morals or incite lustful thought either expressly or by implication from the circumstances under which it is spoken. Seemingly chaste or innocuous language can constitute this offense if the context in which it was said--in which it was used sends an indecent message as reasonably interpreted by commonly accepted community standards.

The phrase "service discrediting conduct" is conduct which tends to harm the reputation of the service or lower it in public esteem.

This instruction substantially mirrored the Military Judges' Benchbook and was consistent with the definition of "indecent" contained in the Manual for Courts-Martial. *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook [Benchbook] para. 3-89-1 (1 Jan. 2010); *Manual for Courts-Martial, United States* (2012 ed.) [*MCM*], pt. IV, ¶ 89.c.

Defense counsel did not object to this instruction or ask the military judge to instruct the members on the level of *mens rea* applicable to this offense.

Appellant now asserts the Supreme Court's decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015),[3] and the subsequent decisions by the CAAF in *United States v. Gifford,* 75 M.J. 140, 146 (C.A.A.F. 2016) (general order violation under

---

[3] Appellant's trial concluded prior to the Supreme Court's decision in *Elonis*.

Article 92, UCMJ, requires recklessness as *mens rea*), and *United States v. Rapert*, 75 M.J. 164, 169 (C.A.A.F. 2016) (*Elonis* inapplicable because the element of wrongfulness is the *mens rea* required to establish communication of a threat under Article 134, UCMJ) require that we set aside appellant's conviction for communicating indecent language. Specifically, appellant argues that the instructions provided by the military judge were inadequate because they included a negligence standard for the *mens rea* required to commit the offense. We disagree that these cases compel us to set aside appellant's conviction for indecent language.

What *mens rea* applies to the offense of indecent language under Article 134, UCMJ, is a question of law which we review de novo. *See United States v. Serianne*, 69 M.J. 8, 10 (C.A.A.F. 2010). We likewise review de novo the legal correctness of the instructions given by the military judge. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014) (citations omitted). Rule for Courts-Martial 920(f) provides that the "[f]ailure to object to an instruction or to omission of an instruction before the members close to deliberate constitutes waiver of the objection in the absence of plain error." "Where there is no objection to an instruction at trial, we review for plain error." *Payne*, 73 M.J. at 22-23 (citing *U.S. v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013)). "Under a plain error analysis, the accused 'has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused.'" *Tunstall*, 72 M.J. at 193-94 (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)).

### 1. Elonis

In *Elonis*, the Supreme Court applied existing precedent in overturning an accused's conviction for communicating a threat through interstate commerce under 18 U.S.C. § 875(c) ("Interstate communications"). 135 S. Ct. at 2012. This statute required the communication be transferred and the communication contained a threat, but was silent as to the *mens rea* required to commit the offense. *Id.* at 2008. At trial, the judge instructed the panel that a statement constitutes a threat if intentionally communicated by the accused "in a context or under such circumstances wherein a reasonable person would foresee" the statement would be interpreted as a serious expression of intent to cause injury or death. *Id.* at 2007. In finding the instruction inadequate, the Court equated this "reasonable person" test with a "negligence standard."

The Supreme Court reiterated several longstanding principles of statutory construction, the first of which is that "[a]lthough there are exceptions, the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Id.* at 2009 (quoting *United States v. Balint*, 258 U.S. 250, 251 (1922)). Second, that a "presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 2011 (quoting *Unites States v. X-Citement Video, Inc.*, 513 U.S. 64, 72

(1994)).  And finally, "[w]hen interpreting federal criminal statutes that are silent on the required mental state, [courts] read into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct."  *Id.* at 2010 (citations and internal quotation marks omitted).

As this court has stated another way, "when a statute is silent on the scienter needed to commit the offense *and* a scienter requirement is needed to separate wrongful from innocent conduct, the *mens rea* required to commit the offense must be greater than simple negligence."  *United States v. Chance*, 2016 CCA LEXIS 241, *4 (Army Ct. Crim. App. 18 Apr. 2016), *affd* 75 M.J. 370 (C.A.A.F. 2016). "[A]bsent confusion whether an offense criminalizes innocent conduct, there is no reason to read into the offense an elevated *mens rea* requirement."  *Id.* at *8.
.

*2. Indecent Language and Mens Rea*

As specified by the President, the offense of indecent language, in the context of this case, requires proof of four elements:[4]

(1) That the accused orally or in writing communicated to another person certain language;

(2) That the person to whom the language was communicated was a child under the age of 16;

(3) That such language was indecent; and

(4) That, under the circumstances the, the conduct of the accused was of a nature to bring discredit on the armed forces.

*See MCM*, pt. IV, ¶ 89.b.  The President, in promulgating this provision, provided the following explanation of the language proscribed:

---

[4] "In analyzing offenses charged under the general article, Article 134, UCMJ, we look at both the statute and the President's explanation in [the] *MCM* . . . to determine the elements of the offense."  *United States v. Zachary*, 63 M.J. 438, 441 (C.A.A.F. 2006).  The President does not define offenses under Article 134 by listing elements and providing explanations, but rather "indicat[es] various circumstances in which the elements of Article 134, UCMJ, could be met."  *United States v. Jones*, 68 M.J. 465, 471 (C.A.A.F. 2010).  "Although *MCM* explanations of offenses are not binding on this Court, they are generally treated as persuasive authority, [ ]to be evaluated in light of this Court's precedent."  *United States v. Miller*, 67 M.J. 87, 89 (C.A.A.F. 2008) (citations omitted).

> "Indecent" language is that which is grossly offensive to
> modesty, decency, or propriety, or shocks the moral sense,
> because of its vulgar, filthy, or disgusting nature, or its
> tendency to incite lustful thought. Language is indecent if
> it tends reasonably to corrupt morals or incite libidinous
> thoughts. The language must violate community
> standards.

Appellant argues "these instructions constitute an insufficient negligence test over an element criminalizing otherwise innocent conduct" in a manner *Elonis* prohibits. That is, the military judge's instructions, which derived from the President's explanation of this offense, "included a negligence standard associated with the key element of whether the language was indecent." If appellant is correct that the President's explanation conveys a negligence standard, then the offense of "indecent language" lies outside of the reach of *Elonis*. Prior decisions of our superior court would bear this out. As appellant notes, our superior court has "previously interpreted communicating indecent language to not require proof of the defendant's intent." *See United States v. French*, 31 M.J. 57, 60 (C.A.A.F. 1990) ("For the act of communicating indecent language, however, there is no additional requirement that it be done with the intent to gratify the 'sexual desires of the accused.' All that is necessary is that the specification allege that the accused communicated an indecent message."); *United States v. Negron*, 58 M.J. 834, 844 (C.A.A.F. 2003) (Although indecent language is not a "specific intent crime, it is sufficient that the language used 'tends reasonably to corrupt morals or incite libidinous thoughts.'"). In other words, negligence, as a general proposition, is not an impermissible *mens rea* under Article 134 if that is the requisite scienter prescribed in the President's explanation of the kind of act violative of the general article. Indecent language, for example, prescribes negligent conduct just as negligent homicide proscribes the killing of another by simple negligence. *See MCM*, pt. IV, para. 85.

Notwithstanding the previous analysis, we would find *Elonis* inapplicable for other reasons. The very definition of indecent language itself poses a very high bar in order to sustain a conviction. First, the word "indecent" in the context of the offense of indecent language has long been seen as synonymous with "obscene." *See French*, 31 M.J. at 59. As such, language that meets the definition of "indecent" is not afforded protection under the First Amendment. *United States v. Moore*, 38 M.J. 490, 492 (C.M.A. 1994) (citations omitted). Second, encompassed within the words "indecent language" under Article 134 are "two alternative definitions, either of which may be relied upon under the offense: (1) grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature; or (2) grossly offensive because of its tendency to incite lustful thought." *United States v. Green*, 68 M.J. 266, 269 (C.A.A.F. 2010) (citing *Negron*, 60 M.J. at 144). Either definition requires language far removed from an innocent utterance. "Grossly" itself is a word suggestive of language with an extreme

meaning or purpose. At its root, the word "gross" is synonymous with "glaring," "flagrant," or "monstrous."[5]   Language with a tendency to incite lustful thought is generally uttered for that very purpose.[6] Essentially, "indecent" sufficiently conveys something more than innocent words. Put differently, innocent language cannot be indecent when judged against the high bar required to prove the offense of indecent language. If indecent language by definition cannot be innocent, *Elonis* does not require an elevated *mens rea*.

While we do not here divine a specific *mens rea* attributable to the offense of indecent language beyond the standard in the President's definition of the offense, we do find that the offense as set forth in the UCMJ and as instructed by the military judge sufficiently separates wrongful from innocent conduct. We do not find this inconsistent with *Rapert*, where our superior court found the word "wrongful" in the context of communicating a threat under Article 134 sufficiently separated wrongful conduct from innocent conduct. 75 M.J. 169. Here, we find the word "indecent," in the context of the elements of the offense of indecent language, sufficiently separates innocent language from that which is wrongful. Accordingly, we find the military judge's instruction was not in error.

### C. Dilatory Post-Trial Processing

Appellant complains that the delay between the conclusion of trial and the convening authority's action was unreasonable and warrants relief. *See generally United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006); *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). The convening authority took action in appellant's case 422 days after the sentence was adjudged, 402 of which are attributable to the government. The record in this case consists of five volumes, and the trial transcript is 585 pages. Appellant through his defense counsel made four separate requests for

---

[5] "gross, adj. and n.4," Oxford University Press, http://www.oed.com/view/Entry/81765?rskey=ZaaXWJ&result=4 (last accessed 23 Oct. 2017).

[6] In *French*, The CAAF adopted the test for determining the sufficiency of a charge of indecent language as whether the language used was "*calculated* to corrupt morals or excite libidinous thoughts." 31 M.J. at 60 (quoting *United States v. Linyear*, 3 M.J. 1027, 1030 (N.M.C.M.R. 1977) (emphasis added). "'Calculated' is generally understood to mean 'intended' or 'planned' to bring about a certain result." *United States v. Brinson*, 49 M.J. 360, 364 (C.A.A.F. 1998) (citation omitted). Nonetheless, the definition of "indecent language" was amended in 1995 to substitute the language "tends reasonably" for the term "calculated" to avoid any misinterpretation that "indecent language" is a specific intent offense. *See* Drafter's Analysis, at A23-24 (2012 ed.).

speedy post-trial processing.[7] In the addendum to the staff judge advocate's (SJA) recommendation, the SJA disagreed that the delay was excessive and concluded that the delay did not constitute legal error warranting corrective action. However, nothing in the record explains the government's delay in the post-trial processing of appellant's case.

We apply the four-factor test in *Barker v. Wingo*, 407 U.S. 514 (1972), to determine whether the post-trial delay in this case results in a due process violation. *United States v. Moreno*, 63 M.J. at 135. These factors are: (1) length of the delay; (2) reasons for the delay; (3) assertion of the right to a timely review and appeal; and (4) prejudice. *Id.* (citing *Barker*, 407 U.S. at 530). Applying these factors, we find no due process violation in the post-trial processing of appellant's case.

Normally, upon finding no due process violation, we would still review the appropriateness of the sentence in light of an unjustified dilatory post-trial processing. UCMJ art. 66(c); *Tardif*, 57 M.J. at 224 ("[Pursuant to Article 66(c), UCMJ, service courts are] required to determine what findings and sentence 'should be approved,' based on all the facts and circumstances reflected in the record, including the unexplained and unreasonable post-trial delay."); *see generally United States v. Toohey*, 63 M.J. 353, 362-63 (C.A.A.F. 2006); *United States v. Ney*, 68 M.J. 613, 617 (Army Ct. Crim. App. 2010); *United States v. Collazo*, 53 M.J. 721, 727 (Army Ct. Crim. App. 2000). Had we not otherwise set aside the sentence, we would have found the sentence, as approved by the convening authority to be appropriate. We therefore grant no relief or limitations on the sentence that may be adjudged at a sentence rehearing. Of course, the limitations set forth in R.C.M. 810 will apply to any sentence adjudged at a rehearing.

**CONCLUSION**

The findings of guilty are AFFIRMED; the sentence is SET ASIDE. A rehearing on the sentence may be ordered by the same or a different convening authority.

Judge FEBBO concurs.

---

[7] Appellant requested speedy post-trial processing on 2 September 2014, 6 October 2014, 3 February 2015 and 2 March 2015. The convening authority took action on 15 May 2015.

WOLFE, Judge, dissenting in part:

I respectfully dissent.[1]

For each panel member who gave a troubling response during voir dire, the military judge instructed the member that they were required to follow the judge's instructions to consider all possible punishments and that no particular punishment was required regardless of the findings. The panel member then satisfied the military judge that they could follow the judge's instructions.

Certainly, the record quoted by the majority adequately supports that the military judge would have been well within his discretion in granting each challenge for cause. However, given the discretion accorded a military judge, at least when presented as a question of law, I would affirm.

"Some offenses are so heinous or so repugnant to common decency that the first thought of a court member might well be that the accused should, if convicted, be sentenced to a punitive discharge." *United States v. Davenport*, 17 M.J. 242, 244 (C.A.A.F. 1984). Indeed, the court described such an impression as "unavoidable." *Id.* (quoting *United States v. Fort*, 16 U.S.C.M.A. 86, 89-90, 36 C.M.R. 242, 245-46 (1966)).

In *United States v. Davenport* the following exchange took place between a panel member (Lieutenant Colonel Hagler) and the civilian defense counsel (Mr. Cohen) during voir dire:

> IDC: And there are some of us, who because of our educational, emotional, personal backgrounds, feel so strongly about a particular type of offense, that regardless of what we lawyers call extenuation and mitigation, the background of the accused, circumstances surrounding the offense, the personal feelings are so strong that in all

---

[1] I briefly note two statutory changes which, due to the date of the offenses, do not alter the disposition of this case. First, the Military Justice Act of 2016 amended the definition of "sexual act" for violations of Article 120 and 120b. *See* Act of Dec. 23, 2016 Pub. L. 114-328, § 5430(a), (b), 130 Stat. 2949 (limiting "sexual act" to penetrations and contacts of the mouth involving a penis, vulva, anus, or scrotum). Had appellant's kiss of HK happened after the effective date of the Act, although it may have violated other statutes, it would not constitute a sexual assault. Second, after appellant committed his offense, amendments to Article 56, UCMJ, made dishonorable discharges a mandatory punishment for sexual assaults under Article 120b. Thus, depending on when the offense was committed, appellant's acts would constitute the offense of sexual assault of a child, sexual assault of a child punishable by a mandatory dishonorable discharge, or not a sexual assault at all.

> honesty the jury member would feel compelled personally
> to vote for expulsion from the Service -- could not
> conceive of honestly and fairly considering to permitting
> such a service member to remain in the Service.
>
> MEMBER (LTC Hagler): Why don't you ask me this, Mr.
> Cohen. Would I want the accused, if proven guilty, to
> serve in my battalion or the United States Army ever in
> any capacity for me -- my answer is definitely not.
>
> IDC: You answered the question, Sir.
>
> MEMBER (LTC Hagler): Okay. Fine.

17 M.J. at 243.

I read the exchange in *Davenport* to be far worse than any of the exchanges in this case. Indeed, the *Davenport* panel member comes across as actively hostile. Nonetheless, after some brief rehabilitative questions by the trial counsel and the military judge, our superior court held that the military judge did not abuse his discretion in denying the challenge for cause. The *Davenport* court cited favorably their decision in *United States v. Tippit*, 9 M.J. 106, 108 (CMA 1966), that "[u]nless it is apparent to us from the record of the *voir dire* that a court member has a closed mind about a case he is to try, denial by the military judge of a challenge for cause should not be reversed."

Here, appellant was charged with sexual assault of child. This is an offense that is of a nature that, as the CAAF stated, "if the accused were convicted, most thinking persons would, in the absence of some extenuating circumstances, conclude that separation from the service was appropriate." *Davenport*, 17 M.J. at 244.

It is this perspective that, in my view, separates this case from *Martinez* and the other cases cited by appellant. In *Martinez* the panel member expressed a fixed view about the punishment for someone convicted of a single specification of drug use. The difference between a single drug use charge (*Martinez*) and multiple specifications of child sexual assault (this case) or murder (*Davenport*) are differences in kind, not degree. While most "thinking persons" might be predisposed to conclude that a punitive discharge is appropriate in cases of murder or child sexual assault, they might reach a different conclusion when an accused has pleaded guilty to using marijuana on a single occasion.

Thus, reading the record in light of *Davenport*, I am not as troubled with the panel's member's responses to leading "artful" questioning. It is neither surprising nor disqualifying that a panel member's initial response to a question that assumes the accused has been convicted of several sexual assaults of a child would reveal a

predisposition to impose a punitive discharge. The question is whether the initial predisposition will yield to the instructions of the military judge or whether the panel member's mind is closed.

The military judge was well positioned to review each panel member's responses during voir dire. We must remember that "resolving claims of implied bias involves questions of fact *and demeanor*, not just law." *United States v. Woods*, 74 M.J. 238, 243 n.1 (C.A.A.F. 2015) (emphasis added). Questions of "implied bias [are] reviewed under an objective standard, viewed through the eyes of the public." *United States v. Wiesen*, 56 M.J. 172, 174 (C.A.A.F. 2001) (citations omitted). However, it is a member of the public who is sitting in the gallery, observing the panel member's demeanor, and has the same information as the military judge. *See United States v. Hines*, 75 M.J. 734, 740 n.5 (Army Ct. Crim. App. 2016). This is why military judges are accorded discretion when ruling on questions of implied bias. (Though, as the majority correctly notes, it is a "sliding scale" of discretion depending on how thoroughly the military judge places his or her findings on the record).

Having reviewed the record, I conclude that the military judge was within his discretion in denying each challenge for cause. The military judge put sufficient facts on the record to warrant some discretion in denying the defense challenges.

Interestingly, the majority does not necessarily disagree with this conclusion. As to each individual challenge for cause the majority appears to agree that the "military judge's rehabilitative efforts [were] sufficient to sustain the denial of the challenge for cause under an implied bias standard." It is the collective effect of several close calls which troubles the majority.

When addressing the "totality of the circumstances" of an implied bias challenge the majority opinion considers not only the circumstances surrounding the panel member, but also the circumstances surrounding the *other* panel members. Thus, the majority finds that while no individual panel member is unfit to serve, the "cumulative impact on the perceived fairness of appellant's panel by having all four of these members sit" warrants reversal. Maj. Op. at *9.

Although a reasonable read of our superior court's case law, I do not believe this is a required standard, and I am concerned that is unworkable from the perspective of the military judge.[2] It is also contrary to how I interpret R.C.M.

---

[2] Assume, for example, that the military judge finds that while no individual member should be removed for cause, but that collectively (under the totality of the

(continued . . .)

18

912(f)(3) which places the "burden of establishing that grounds for a challenge exist is upon the party making the challenge."

Thus, I find no error of law which requires this court to set aside the sentence in this case.[3]

FOR THE COURT:

JOHN P. TAITT
Deputy Clerk of Court

---

(. . . continued)
circumstances) the members constitute an unfair panel. Must counsel make a separate objection to the panel as a whole? Which panel member should the military judge remove? How many panel members should the military judge remove?

[3] Whether the sentence "should be approved" under Article 66(c) is a closer call. The question presented is a close enough call that–when combined with the hints of unlawful command influence lurking behind the voir dire–this case may be a good candidate for the exercise of our Article 66(c) authority. Decided as a matter of law, however, I cannot join a majority opinion that applies an implied bias test to the panel as a whole rather than to each discrete challenge for cause.