# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
WOLFE, SAULSSOLIA, and ALDYKIEWICZ
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist JORDAN T. RODRIGUEZ**
**United States Army, Appellant**

ARMY 20160787

Headquarters, Fort Riley
Charles L. Pritchard, Jr., Military Judge
Lieutenant Colonel Joseph B. Mackey, Staff Judge Advocate

For Appellant:  Captain Steven J. Dray, JA; Frank J. Spinner, Esquire (on brief).

For Appellee: Lieutenant Colonel Eric K. Stafford, JA; Major Hannah E. Kaufman, JA; Captain Meredith M. Picard, JA (on brief).

31 January 2019

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

Per Curiam:

Following his convictions for two specifications of sexual assault and one specification of adultery, appellant contends that he did not receive a speedy trial, challenges his sexual assault convictions on factual and legal sufficiency grounds, and contends that the military judge erred in instructing the panel on the applicable *mens rea* for sexual assault.[1]  Only the instructional issue requires extended

---

[1]  An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of sexual assault by bodily harm and one specification of adultery, in violation of Articles 120 and 134, Uniform Code of Military Justice [UCMJ].  The panel sentenced appellant to a dishonorable discharge, confinement for ten months, total forfeitures, and reduction to the grade of E-1.  The convening authority approved the adjudged sentence.  This case is before us for review pursuant to Article 66, UCMJ.

discussion, but that issue ultimately entitles appellant to no relief.[2]  As such, we affirm appellant's convictions.

## BACKGROUND

*The Facts*

Appellant's convictions stemmed from events in the early morning hours of 27 September 2015, in the on-post housing area of Fort Riley, Kansas.  The victim, MS,[3] was eighteen years old.  Between May and August of 2015, MS had graduated high school, married Army Private First Class (PFC) JA, and moved from Washington State to join PFC JA at Fort Riley.

Private (E-2) Vincent Macario lived next door to MS and PFC JA in Fort Riley family housing.  Prior to 26-27 September 2015, MS and PFC JA had socialized occasionally with PV2 Macario and his wife.

---

[2] Appellant's case is a companion case to *United States v. Macario*, ARMY 20160760, 2018 CCA LEXIS 494 (Army Ct. Crim. App. 12 Oct. 2018) (mem. op.). The two cases were tried within days of each other at Fort Riley in November and December of 2016, and the government's case-in-chief was nearly identical in the two cases.

Appellant makes essentially the same speedy-trial claim as the one we rejected in *Macario*, 2018 CCA LEXIS 494, at *9-11.  We similarly reject appellant's claim. The government's withdrawal, dismissal, and subsequent re-preferral of charges against appellant were for a proper purpose, and were not a subterfuge to avoid the Rule for Courts-Martial [R.C.M.] 707 speedy-trial clock.  *See* R.C.M. 707(a) (requiring that accuseds be "brought to trial" within 120 days).  As such, the government's withdrawal and dismissal reset the R.C.M. 707 speedy-trial clock to zero.  *See* R.C.M. 707(b)(3)(A)(i); *United States v. Hendrix*, 77 M.J. 454, 456-57 (C.A.A.F. 2018).  Because the government brought appellant to trial within 120 days of re-preferral, there was no speedy-trial violation.

We also reject appellant's factual and legal sufficiency challenges to his sexual assault convictions.  For the reasons set forth in the "Background" section of this opinion, a rational trier of fact could have found the elements of the contested crimes beyond a reasonable doubt,  *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), and we ourselves are convinced of appellant's guilt beyond a reasonable doubt.  *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[3] At various times during appellant's trial, "MS" is referred to as "MA."  We use "MS" to avoid confusion.

Appellant was PV2 Macario's friend. MS met appellant for the first time on 25 September 2015, when appellant and PV2 Macario came to MS's home to borrow "a mop or something," and ended up staying for approximately one hour.

The next evening, on 26 September 2015, MS and PFC JA argued about PFC JA "unblocking" his ex-girlfriend on Facebook and "liking" one of his ex-girlfriend's photographs. MS left the home to "cool off." Appellant -- who, along with others, had been visiting PV2 Macario next door -- approached MS on the street, asked about MS's well-being as she looked distraught, and invited MS and PFC JA to go to a bar with the group. MS declined, but gave appellant her phone number and said appellant could text her so that she and PFC JA could come to PV2 Macario's house to socialize later. MS then returned home, took two shots of alcohol, and reconciled with PFC JA. Later, the couple drank a shot of alcohol together (MS's third).

Around 0200 or 0300 on 27 September 2015, appellant and PV2 Macario knocked on MS's and PFC JA's door. PFC JA was asleep, but MS was still awake, watching a movie. Appellant and PV2 Macario invited MS and PFC JA to appellant's house; MS initially declined because PFC JA was asleep, but ultimately agreed. At PV2 Macario's house, PV2 Macario handed MS a beer, asked about MS's earlier argument with PFC JA, and told MS that she should "leave" PFC JA. MS told PV2 Macario that the fight was "nothing," that she "loved" PFC JA, and was "not going to leave him over something like that." MS took three additional shots of alcohol while playing "rock, paper, scissors" as a drinking game, first with PV2 Macario, and then with both appellant and PV2 Macario.

A group from the gathering, including MS, PV2 Macario, appellant, and Specialist (SPC) W, walked to a nearby park. At the park, while MS and SPC W sat on the swings, PV2 Macario and appellant were engaged in a conversation behind them on a bench.[4] On the walk back to appellant's house, appellant lagged behind the group, and, when MS told appellant to "catch up," appellant called her back to him. Appellant put his hands on MS's waist, told MS she was "really attractive," and "leaned in for a kiss." MS rebuffed appellant, telling him, "You're drunk. My husband is right over there. This isn't okay."

As MS and appellant approached PV2 Macario's house, PV2 Macario "rush[ed]" up to MS and appellant and said that PFC JA was "really mad and upset"

---

[4] MS testified that "[a]t one point, [she] turned around and looked at [appellant and PV2 Macario] and they were . . . staring at us and talking." MS explained that she "had gotten an eerie feeling . . . that . . . something wasn't right."

and that MS needed to "hide."[5]  MS was "confused" as to why PFC JA would be mad, but was taking "longer to process things" due to her alcohol consumption. When MS indicated that she wanted to "go find" PFC JA, PV2 Macario and appellant said they would talk to him, and continued to "lead[] MS to a hiding spot" in a small storage shed located to the rear of MS's and PFC JA's quarters.

After guiding MS into the shed and closing the door, PV2 Macario and appellant entered within five to ten seconds afterward, and asked MS "whether she could keep a secret."  MS responded "yes."  At that, appellant responded "Okay, good," and began touching MS's hips as PV2 Macario started touching MS's chest. MS told the two repeatedly, "No," "Stop," and "I don't want to do this.  I love [PFC JA].  I love my husband."  PV2 Macario and Appellant told MS to be quiet, and "did the shhh noise."  Appellant pulled MS's sweatpants down, bent her over so that her head was facing PV2 Macario, and penetrated MS's vulva with his penis.  PV2 Macario simultaneously took his hand, put it "between [MS's] teeth, on the outside of [her] cheeks," "pried" MS's mouth open, put his other hand on the back of MS's head, and put his penis in MS's mouth.  PV2 Macario and appellant "both began thrusting."  MS, "panicking," tried to "block [the assault] out" of her mind.  The next thing she remembered was PV2 Macario and appellant opening the shed door and stepping out.

Immediately after the assault, MS woke up her husband, called her mom, and called the military police.  DNA analysis later detected appellant's semen in MS's mouth (to a certainty of 1 in 4.3 quadrillion); MS's DNA in appellant's underwear (1 in 67 quadrillion); MS's DNA on appellant's penis swab (1 in 73 quadrillion); MS's DNA on PV2 Macario's underwear (1 in 40 quadrillion); and MS's DNA on PV2 Macario's penis swab (1 in 32 trillion), and on his scrotum (1 in 82 billion).

Appellant presented an alternative narrative of a consensual encounter between the three.  Appellant testified that he had grabbed MS's hand on the walk to the park, and that she had held his hand back, and that the two "kissed and made out for about ten seconds."  At the park, appellant explained that MS had sat "right next to" him, and that he felt that MS was attracted to him.  When the group returned from the park, appellant testified that SPC W went inside, leaving himself, PV2 Macario, and MS outside on the porch.  MS then kissed PV2 Macario "right in front of" appellant, and then "[t]urned and kissed" appellant.  After MS turned back and forth between the two multiple times, appellant stated that,

> Everyone started using their hands, and it's starting to
> heat up.  I had my hands on her leg, hers were on mine,
> and [PV2] Macario was touching [MS]. I was touching her

---

[5] This was untrue. PFC JA was still asleep at home.

private parts over her clothes, and she was touching mine. And the same thing with [PV2] Macario as well.

Appellant indicated that he was "surprised," but it was "definitely a heat of the moment type of thing." PV2 Macario indicated that he wished the three had "somewhere to go," to which MS responded that her shed was empty. Before the three went into the shed, MS went inside her house to ensure that her husband was still asleep.

Inside the shed, according to appellant, MS was kissing appellant and PV2 Macario "one and then the other." According to appellant, both he and PV2 Macario separately "asked" MS if they could have oral sex. Ultimately, appellant described both himself and PV2 Macario having both oral and vaginal sex with MS, and indicated that MS did not resist, never said no, never said to stop, and was "moaning." Afterwards, according to appellant, MS sat with him on the curb as he smoked a cigarette. MS later went inside her own house, and, in a surprise to appellant, the Military Police arrived approximately fifteen to twenty minutes later.

*The Parties' Discussion of the Mistake of Fact Instruction*

During an Article 39(a) session to discuss panel findings instructions, the military judge had the following colloquy with appellant's trial defense counsel regarding the mistake of fact as to consent instruction:

> MJ: I intend to give the following instructions . . .
> mistake of fact as to consent related to Charge I and its
> specifications; and the concomitant voluntary intoxication
> instruction related to the mistake of fact as to consent . . . .
> Do Counsel concur or request additional instructions?
>
> . . . .
>
> DC: And you say mistake of fact as to consent as to both
> specifications of Charge I?
>
> MJ: Yes.
>
> DC: Nothing further, Your Honor.

Prior to the military judge *sua sponte* raising the issue, the parties had not discussed the applicability (or non-applicability) of a mistake of fact as to consent instruction. After the above colloquy, but before instructing the panel, the military judge provided a written copy of his proposed instructions to the parties.

5

Appellant's trial defense counsel raised no objection either to the military judge giving the mistake-of-fact instruction or to the wording of that instruction.

*The Instruction*

As relevant here, the military judge subsequently instructed the panel as follows:

> The evidence has raised the issue of mistake of fact as to consent in relation to the offenses of sexual assault. There has been testimony tending to show that, at the time of the alleged offenses, the accused mistakenly believed that [MS] consented to the sexual conduct alleged in the specifications of Charge I.
>
> Mistake of fact as to consent is a defense to those offenses. "Mistake of fact as to consent" means the accused held, as a result of ignorance or mistake, an incorrect belief that the other person consented to the sexual conduct as alleged. The ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. To be reasonable, the ignorance or mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other person consented. *Additionally, the ignorance or mistake cannot be based on the negligent failure to discover the true facts. "Negligence" is the absence of due care. "Due care" is what a reasonably careful person would do under the same or similar circumstances.* (emphasis added).

At the conclusion of the military judge's findings instructions to the panel, the military judge asked whether counsel "object[ed] to the instructions given or request additional instructions." Appellant's trial defense counsel answered, "No, Your Honor."

## LAW AND ANALYSIS

The panel convicted appellant of two specifications of sexual assault by bodily harm, in violation of Article 120(b)(1)(B), UCMJ. The statutory elements of that Article include: (1) that the accused committed a sexual act upon another person by; (2) causing bodily harm to that other person. *Manual for Courts-Martial, United States* (2012) [*MCM*], pt. IV, ¶ 45.a.(b)(1)(B). Bodily harm is defined as "any offensive touching of another, however slight, including any nonconsensual

sexual act or nonconsensual sexual contact." *Id*. at ¶ 45.a.(g)(3). In appellant's case, the two alleged sexual acts – the penetration of MS's vulva and mouth with appellant's penis – doubled as the alleged bodily harm. Thus, for appellant to be found guilty of sexual assault, the government had to prove *both* that appellant engaged in the sexual acts with MS, *and* that MS did not consent to the acts.

For the first time on appeal, appellant asserts the military judge erred by instructing the panel that a negligence *mens rea* was sufficient to make appellant's otherwise lawful conduct criminal under Article 120(b)(1)(B), UCMJ. Specifically, appellant asserts a finding of guilty as to this article requires a *mens rea* of either "intentional, knowing or reckless" as to the element of "bodily harm" when the sexual act is nonconsensual and constitutes the charged bodily harm. We recently addressed this very issue, that is, the *same* complaint about the *same* panel instruction regarding the *same* sub-section of Article 120 in the *same* procedural posture in *United States v. Peebles*, __M.J. __, 2019 CCA LEXIS 8 (Army Ct. Crim. App. 10 Jan. 2019).

*Peebles* guides our resolution of appellant's case. First, regarding the appropriate standard of review, while appellant contends that we should review the military judge's instructions de novo, he is entitled, at most, to plain error review. Appellant's trial defense counsel not only failed to object to the military judge's mistake-of-fact instruction, he affirmatively indicated that he wanted the military judge to apply the instruction "to both specifications of Charge I." At the close of the military judge's findings instructions, appellant's trial defense counsel affirmatively indicated that he had no objection to the instructions.

While we noted in *Peebles* that similar conduct from Peebles's trial defense counsel could amount to waiver of an allegation of instructional error, *Peebles*, __ M.J.__, 2019 CCA LEXIS, at *8-10, we ultimately "save[d] for another day" the determination of whether a statement of "no objection equate[d] to waiver of instructional error." *Id*. at *10 (citing *United States v. Davis*, 76 M.J. 224 (C.A.A.F. 2017) (applying plain error analysis to forfeited instructional error)). We similarly apply plain error review here, as, like *Peebles*, "this case does not turn on determining the correct standard of review." *Peebles*, __ M.J.__, 2019 CCA LEXIS, at *10; *see also, e.g., United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (applying plain error review to forfeited claim of instructional error); *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014); *Davis*, 76 M.J. at 229.

"Under a plain error analysis, the accused has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *Tunstall*, 72 M.J. at 193-94 (citation omitted). "[T]he failure to establish any one of the prongs is fatal to a plain error claim." *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (citation omitted).

Second, *Peebles* compels a finding that the same panel instruction at issue in that case amounted to "clear and obvious error"[6] in appellant's case for the same reason; namely:

> [W]hen a statute is silent on the scienter needed to commit the offense and a scienter requirement is needed to separate wrongful from innocent conduct, the *mens rea* required to commit the offense must be greater than simple negligence.

*Peebles*, __ M.J.__, 2019 CCA LEXIS, at *12 (citing *Elonis v. United States*, 135 S. Ct. 2001, 2010 (2015)).

Article 120(b)(1)(B), UCMJ, is such a "silent on the scienter" statute. *Peebles* noted that other sub-sections of Article 120, UCMJ, such as Article 120(b)(2), were by contrast not "silent on the scienter needed to commit the offense," but rather expressly set forth a negligence *mens rea* requirement. *Id*. at *15 (noting that Article 120(b)(2) "provides for a conviction of sexual assault where the accused 'commits a sexual act upon another person when the person *knows or reasonably should know* that the other person is asleep, unconscious, or otherwise unaware'") (emphasis in original). We thus could "infer that Congress did not intend for a conviction of sexual assault by bodily harm under Article 120(b)(1)(B), UCMJ, to be predicated on negligence." *Id*. at *15. This court ultimately held in *Peebles* that the military judge had committed "obvious error by failing to instruct the members that appellant could only be found guilty if he acted, at a minimum, with a reckless disregard as to [the victim's] lack of consent." *Id*. at *19-20. As the panel instruction here was identical to the instruction in *Peebles*,[7] we likewise find

---

[6] Our superior court has explained that the applicable test is whether an error is clear and obvious "at the time of appeal." *United States v. Williams*, 77 M.J. 459, 462 (C.A.A.F. 2018). As *Peebles* itself found that the military judge there had committed clear error, the error is certainly clear and obvious at the time of *appellant's* appeal. *See, e.g., United States v. Mullins*, 69 M.J. 113, 117 (C.A.A.F. 2010) ("[i]t follows that an error that was plain and obvious in [an earlier case] would be plain and obvious in a subsequent case when there were no intervening changes in the law").

[7] It is unsurprising that the instructions in *Peebles* and the instant case were identical, as they were in concert with the then-applicable Military Judge's Benchbook. *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judges'

(continued . . .)

that appellant has shown plain and obvious error, thus satisfying the first two prongs of plain error review.

Third, like *Peebles*, appellant's claim ultimately fails, because appellant cannot show that the error materially prejudiced his substantial rights. Stated differently, appellant cannot show a "reasonable probability" that, "but for" the erroneous instruction, the panel would have found that appellant acted less than recklessly, and thus acquitted him. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (to demonstrate material prejudice to substantial rights, defendants must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different") (citation omitted); *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017).

Appellant's court-martial presented two diametrically opposing narratives regarding MS's consent or lack of consent. MS explained that she was quite clear and adamant about her non-consent to the sexual acts with appellant and PV2 Macario, and told the two repeatedly, "No," "Stop," "I don't want to do this," and "I love my husband." Appellant, on the other hand, contended that MS was a willing participant in the sexual acts with both himself and PV2 Macario, and, indeed, that it was MS who suggested that the three go into the shed. In other words, either appellant *knew* that MS was not consenting to the sexual acts, or MS *actually consented* to the acts. *Cf. Elonis*, 135 S. Ct. at 2012 ("no dispute" that knowledge-level *mens rea* – there, knowledge that a specific communication would be viewed as a threat – was sufficient for criminal liability). The panel, of course, was free to believe MS and to disbelieve appellant. *See, e.g., United States v. Nicola*, __M.J. __, 2019 CAAF LEXIS 24, at *11-13 (C.A.A.F. 9 Jan. 2019). Thus, this case did not present the middle ground where appellant could have been negligent in his mistaken belief that MS consented when she actually did not consent. As a result, the military judge's erroneous *mens rea* instruction did not materially prejudice appellant's substantial rights.

## CONCLUSION

Upon consideration of the entire record, the findings of guilty and sentence are AFFIRMED.

---

(. . . continued)

Benchbook [Benchbook], para. 3-45-14 n.13 (10 Sep. 2014). *But see, e.g., United States v. Riley*, 72 M.J. 115, 122 (C.A.A.F. 2013) ("[t]he Benchbook is not binding as it is not a primary source of law").

RODRIGUEZ—ARMY 20160787



FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court