*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JP.

---

PEOPLE OF THE STATE OF MICHIGAN,

    Petitioner-Appellee,

v

JP,

    Respondent-Appellant.

FOR PUBLICATION
September 24, 2019
9:00 a.m.

No. 344812
Gogebic Circuit Court
Family Division
LC No. 2017-000048-DL

---

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

GLEICHER, J.

Young teenagers sometimes make poor judgments born of impetuosity, immaturity, and an inability to foresee the painful consequences of their actions. Here, four teenaged girls decided they did not like a 13-year-old boy, and fantasized via group text messages about killing him, his dog, and even his goldfish. The texts are not pretty or clever. They also were not sent to the boy. He learned the content of the hateful messages from his mother, and never actually read them.

The prosecutor charged one of the girls, respondent JP, with a violation of MCL 750.540e(1), which subjects those who send text messages intended to "terrorize, frighten, intimidate, threaten, harass, molest or annoy" another person to criminal punishment. Despite that no evidence supported that respondent intended that the boy would ever see the text messages, a jury adjudicated her as responsible for the violation and the trial court entered a dispositional order. Because no evidence or reasonable inference suggests that the teenagers intended to terrorize, frighten, intimidate, threaten, harass, molest or annoy the teenaged boy discussed in their texts, we vacate the orders of adjudication and disposition.

I

The four involved girls formed a "Snapchat" group. Snapchat is an application for mobile phones used to share text messages, photographs, and other images among a defined group of "real friends." See <https://www.youtube.com/user/OfficialSnapchat/about>. One feature of the application vaporizes the messages after a few seconds unless a recipient deliberately saves them. Even then, the messages remain accessible for only 24 hours unless a participant captures a "screen shot." In other words, the messages are usually temporary and ephemeral, by design. See *State v Bariteau*, 884 NW2d 169, 172 n 1; 2016 SD 57 (2016) ("Snapchat is an image messaging mobile phone application in which a user can send a photograph or text message with a set time to expire. The receiving user can only view the text message or photograph for one to ten seconds before the image or text message expires and is automatically deleted from the mobile phone.").

Each of the girls in the Snapchat group used a personally selected moniker rather than their real names. Respondent was 7Up. The other girls were Lady Gaga, Dream Ruiner, and Me. All were in sixth or seventh grade. The boy involved, S, was a seventh grader. The girls assigned a name to their Snapchat: "R.I.P. [S] (& Goldfish);" R.I.P., of course, means "rest in peace."

The girls did not like S. He pushed the books off Lady Gaga's desk and called her "fat and gay." S also "shoved" the books off respondent's desk. S denied the allegations.[1] Based on the perceptions of at least some of the girls that S had transgressed the norms of middle school decorum, the girls fantasized about killing S, his goldfish, and his dog (if he had one). Here is a sample of their creative work:

> *7UP* [respondent]: I WILL MARGARITA SQUARE UP LIKE [S]'S HEAD
>
> *LADY GAGA*: HAHAHAHAHHAHAHAGA [sic]
>
> *7UP*: LETS GOOOOO
>
>
>
> *LADY GAGA*: WE SHOULD STAB HIM

---

[1] Outside the jury's presence, the judge twice observed that he found S's protestations of innocence unconvincing. After the verdict was rendered, the judge commented, "Oh, and the last thing I was going to say is, you know, even though I do believe he pushed your books, I do believe he was a bug on a lot of this stuff; I think he was doing it to get your attention." At the dispositional hearing, the judge reiterated, "I said on the record I do believe he was annoying but I also feel that part of the reason he is annoying is because he is a challenged young man and he was trying to get your attention. He was trying to get you girls to like him in a completely, not a good strategy type of way."

*DREAM RUINER*:

*7UP*:  YES

*  *  *

*7UP*:  MURDER HIM
      LET'S DO IT

*LADY GAGA*:  AND HIS FAMILY
        AND HIS DOG

*7UP*:  YEEEESSS

*DREAM RUINER*:  MURDER HIM

*LADY GAGA*:  AND HIS GOLD FISH

*DREAM RUINER*:  XD[2]

*ME*:  What if he doesn't have a dog!!

*7UP*:  WE WILL DRUG HIM THEN STAB HIM TO DEATH

*LADY GAGA*:  And rip his skin off
        And fee[d] it to his dog

*7UP*:  Yes

*LADY GAGA*:  [cartoon bitmoji of a woman captioned "wow, such amaze, very story, :O, many interest, so care"]

*7UP*:  YES TO ALL O IT

*  *  *

*LADY GAGA*:[3]

---

[2] "XD" in electronic communications represents an "emoticon" for "laughing out loud."  The letter "X" represents "the eyes all scrunched up" and the letter "D" "represents a really big mouth that is laughing."  See What Does "XD" Mean in Chatting?, available at <https://www.reference.com/technology/xd-mean-chatting-1723977c2976c9e3> (accessed September 17, 2019).



www.shutterstock.com · 55445056

*7UP*:  AWEEEEEE

*LADY GAGA*:  @[S]'s gold fish

*7UP*:  WHO ELSE HATES [S] IN HERE

*LADY GAGA*:  ME

\* \* \*

*7UP*:  PATRICIA WILL KIL [sic] HIM ONE DAY

*LADY GAGA*:  Yee

\* \* \*

*DREAM RUINER*:  His head will turn to a fucking rectangle

*LADY GAGA*:  A CIRCLE
      YES

\* \* \*

*ME*:  Or a triangle??!?!!?

*LADY GAGA*:  Yes then I'll play volleyball with it
      ILLUMANATI CONFIRMED

---

[3] Lady Gaga found a clean version of this photograph for the Snapchat thread.  The image has since been licensed on the Internet and that version is included in this opinion.

*DREAM RUINER*:

                           *   *   *

*7UP*:  [triangle graphics]
    @me shipping myself to china after killing [S]

*ME*:  HAHAHHAHAHAHA

*DREAM RUINER*:  I WILL PAY FOR SHIPPING

                           *   *   *

*7UP*:  ILL BE THROWN AWAY IN THE TRASH ALONG WITH [S']S REMAINS

*DREAM RUINER*:  You will be shipped on a luxury cruise ship
    XD
    XDD

It is reasonable for a school to condemn and punish (by suspension, for example) the girls' misuse of social media and the potential for cyberbullying it represents.[4] Children should be strongly encouraged to use digital media responsibly, to consider all the potential consequences of their words, and to refrain from any aggressive, inflammatory, or hurtful commentary. But school rules are not criminal laws. The relevant facts in this criminal case include that none of the girls took any action intended to communicate the threats to S. S was not invited to the Snapchat, and according to his testimony, he never actually read the texts.[5] The messages came to light only after someone mentioned their existence to S, who asked Me about it. S's mother informed the school principal of the existence of the Snapchat. The

---

[4] The Michigan Legislature recently enacted a statute making cyberbullying a misdemeanor. MCL 750.411x, enacted by 2019 PA 47, effective March 27, 2019. Notably, the statute contains two intent requirements consistent with our analysis:

> "Cyberbully" includes posting a message or statement in a public media forum about any other person if both of the following apply:
>
> (*i*) The message or statement is intended to place a person in fear of bodily harm or death and expresses an intent to commit violence against the person.
>
> (*ii*) The message or statement is posted with the intent to communicate a threat or with knowledge that it will be viewed as a threat. [MCL 750.411x(6)(a).]

[5] While using Snapchat, the participants can tell if someone is added to their assembled collection of chatters. They agreed that S was never added to the group.

principal brought the girls into his office, seized their phones, and contacted law enforcement. Respondent was charged with a violation of MCL 750.540e(1)(a):

(1) A person is guilty of a misdemeanor who maliciously uses any service provided by a telecommunications service provider with intent to terrorize, frighten, intimidate, threaten, harass, molest, or annoy another person, or to disturb the peace and quiet of another person by any of the following:

(a) Threatening physical harm or damage to any person or property in the course of a conversation or message through the use of a telecommunications service or device.

We turn to a detailed review of the evidence relevant to respondent's intent.

Lady Gaga testified that she never told S about the Snapchat and was "surprised" that he found out about it. She explained, "[H]e like wasn't added into the group chat and nobody else that was really friends with him or close to him was added into the group chat and so I really didn't think he was going to know about it." The texts were "just a way of kind of venting I guess, in some twisted way." Lady Gaga testified that she deleted the screenshot texts regarding S from her phone. On cross-examination she agreed that she "never thought any of this would get back to S."

Me testified that S was her friend, and still is. S found out about the Snapchat from someone else, and asked her about it:

Q. So from what you recall [S] had some kind of idea that this Snapchat existed and he asked you if it existed or not?

A. Yes.

Q. What'd you tell him?

A. I told him it did and he asked me to show him and I showed him.

Q. So, when you say he asked me to show him, you showed him these messages?

A. Yes.

Me conceded that "[i]t was never meant for it to be sent to [S]."

Dream Ruiner, a sixth grader, testified that she did not "really" know S, but understood "that he'd given some of the other girls in the group a hard time." She, too, believed that the Snapchat was "private" while the girls were engaged in it, although she saved the messages on her phone. Dream Ruiner suspected that Me had started the Snapchat group.

During his testimony, S contradicted Me's testimony regarding his view of the Snapchat. He recalled that Me exposed the *name* of the Snapchat, but not the messages themselves:

-6-

*Q.* How did you find out that the group existed?

*A.* [Me] came to me and showed me it.

*Q.* And when you say she showed it to you, what did she show you?

*A.* She just showed me the group chat name.

*Q.* The group chat name?

*A.* Yeah.

*Q.* And what was the group chat name?

*A.* R.I.P. [S] and his goldfish.

*Q.* At the time that she showed that to you, what did she show it to you with?

*A.* She just showed me it out of the blue.

*Q.* I mean, like, was it a piece of paper, was it a computer?

*A.* No, it was on her phone.

\* \* \*

*Q.* Did [Me] show you the messages in addition to the name of the Snapchat group?

*A.* She didn't show me the messages.

*Q.* Okay, so just the name?

*A.* Yes.

*Q.* Have you ever personally read the messages?

*A.* No.

*Q.* Did you ever talk to [Me] about it after that first time when she showed you the name of the group?

*A.* No.

S's mother informed him of the content of the texts, which "kind of made me feel worse," S admitted. On cross-examination, S agreed that respondent had never said anything to him that he viewed as harassing or annoying, and had never communicated with him at all by using a phone, a computer, or a tablet.

-7-

Respondent was in the 8th grade at the time of the adjudication trial. She testified that she believed the Snapchat conversation was "just private." "I had no clue people were saving it," she explained, and never intended that the communications would be shown to S. And, consistent with S's testimony, respondent agreed that she had never communicated with him in any fashion.

Thus, no direct evidence supported that respondent intended that her threats would be communicated to S. The girls agreed that they did not intend for S to see their messages. S testified that he did not learn the content of the messages until his mother told him about them. No evidence was presented warranting even an inference that JP did, in fact, anticipate, expect, plan or desire that S would learn of the texts.

From the onset of the case, respondent's counsel insisted that respondent lacked an intent to threaten or harass S, and that such intent was fundamental to a finding of responsibility for having violated MCL 750.540e(1)(a). The prosecutor acknowledged that S had not been included in the Snapchat, but focused on the girls' awareness that "[t]here's no such thing as privacy on the internet." The girls should have known, the prosecutor maintained, that S likely would find out about their "malicious" threats.

Regarding the offense, the trial court instructed the jury as follows:

> The juvenile is charged with a crime of malicious [use] of a telecommunications device. To prove this charge, the prosecutor must prove each of the following all beyond a reasonable doubt. First that the use of telephone line or any electronic medium of communication, the internet, a computer, a computer program, a computer system, a computer network, or any electronic medium of telecommunication [sic]. *It does not matter whether the communication was actually sent or received.* It was pretty much acknowledged that the medium here was a cell phone and a Snapchat. 2. Second, that the juvenile did this maliciously. This means the juvenile did the act with intent to terrorize, frighten, intimidate, threaten, harass, molest, annoy, or disturb the peace and quiet. It's an either/or again as I pointed out to you; it does not have to be all of them. Third, the communication threatened physical harm or damage to any person or property through the use of the device. [Emphasis added.]

The jury found respondent responsible. Her counsel brought a motion for a directed verdict or a new trial, arguing that there was no evidence that respondent (or the other girls) intended to threaten or disturb S in any manner. The prosecutor rested her response on the content of the girls' statements, contending that they "could certainly be viewed as intending to terrorize, frighten, intimidate, threaten, harass, molest, annoy or disturb the peace and quiet of someone else[.]" The trial court concluded that because "in the end" S was intimidated and felt threatened, the jury's verdict would stand.

Respondent now appeals.

II

Respondent contends that the jury's verdict is against the great weight of the evidence. Because the girls did not intend that S would see their texts, respondent argues, she cannot be adjudicated responsible based on the threatening or offensive language they employed. Respondent is correct. The statute underlying the jury's verdict requires proof of specific intent "to terrorize, frighten, intimidate, threaten, harass, molest, or annoy *another person*, or to disturb the peace and quiet of *another person*[.]" MCL 750.540e (emphasis added). No evidence supports that respondent specifically intended that S would ever read or learn of the text messages. Accordingly, the jury's verdict contravened the great weight of the evidence, and the orders of adjudication and disposition must be vacated.

A verdict is against the great weight of the evidence when "the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). We review for an abuse of discretion a trial court's denial of a motion for a new trial grounded in a great weight of the evidence claim. *People v Unger*, 278 Mich App 210, 232; 749 NW2d 272 (2008). A "court necessarily abuses its discretion when it makes an error of law." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). An abuse of discretion may also occur when a trial court "operates within an incorrect legal framework." *People v Hine*, 467 Mich 242, 250-251; 650 NW2d 659 (2002). We review de novo whether conduct falls within the scope of a criminal law. *People v Cassadime*, 258 Mich App 395, 398; 671 NW2d 559 (2003).

We begin our analysis by repeating the language of the statute at the center of this case:

(1) A person is guilty of a misdemeanor who maliciously uses any service provided by a telecommunications service provider with intent to terrorize, frighten, intimidate, threaten, harass, molest, or annoy another person, or to disturb the peace and quiet of another person by any of the following:

(a) Threatening physical harm or damage to any person or property in the course of a conversation or message through the use of a telecommunications service or device. [MCL 750.540e(1)(a).]

In construing this statute, our goal is to ascertain and give effect to the Legislature's intent. *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999). The language of this statute is unambiguous, and so we presume that the Legislature intended the meaning conveyed. *Id*.

In *People v Taravella*, 133 Mich App 515, 523; 350 NW2d 780 (1984), this Court held that MCL 750.540e is a specific intent crime, and we reaffirm that holding.[6] To be convicted under the statute, a defendant must specifically intend to annoy, terrorize, or disturb the peace of

---

[6] Cases decided before November 1, 1990 can be considered persuasive authority, although they are not binding precedent. MCR 7.215(J)(1).

*another person*, and must use a telecommunications device to do so. *Id.* The listener's perception of the nature of the call does not determine a defendant's liability, this Court emphasized in *Taravella*, as "[t]he statute clearly provides that the focus is on the caller; it is the malicious intent with which the transmission is made that establishes the criminality of the conduct." *Id.* at 521. In other words, the statute criminalizes the use of a telephonic device when the defendant harbors the specific intent to harass, terrorize, annoy, or otherwise interfere with the peace and quiet of another person.

No evidence supports that respondent intended to harass, terrorize, annoy, or otherwise interfere with S's peace and quiet. Rather, the great weight of the evidence demonstrates precisely the opposite: none of the Snapchat participants intended that S would *ever* read or see the texts, or would ever feel threatened by their existence. In *Taravella*, this Court highlighted that even if a recipient *does* receive a telephonic communication, the "listener's subjective perceptions, without the necessary intent on the part of the caller" do not make out the crime. *Id.* The focus remains on the intent of the sender.

The prosecution asserts that respondent's "[m]alice is apparent from the graphic nature of the threats and the attempt to build consensus on hating [S] with whoever else was in the group chat." This argument disregards the language of the statute, which requires that the maker of a threat intend that the threat disturb or otherwise negatively affect "another person." The nature of the language, standing alone, does not make out the crime, nor does the fact that violence was discussed.[7] Rather, *Taravella* instructs that MCL 750.540e survives constitutional scrutiny precisely because it pairs speech with a speaker's malicious intent that the content of the speech be communicated to a listener, and some form of follow-through on that intent.[8]

---

[7] Although not raised as an issue on appeal, we note that the jury instruction regarding the offense inaccurately posited that "[i]t does not matter whether the communication was actually sent or received." The failure to actually send a communication bears on a defendant's intent to annoy or harass the recipient, and thus matters. Although the record is vague regarding the source of the jury instruction, the court appears to have obtained the "does not matter" language from M Crim JI 35.1, which relates to an entirely different crime (interfering with an electronic communication). Moreover, the instruction omitted a critical part of the statutory language—that the defendant intended "to terrorize, frighten, intimidate, threaten, harass, molest, or annoy *another person*." The statute's intent requirement mandates that speech be deliberately aimed at "another person." By omitting those words, the court inaccurately conveyed the statute's reach. Our holding does not rest on these grounds, however.

[8] In this case, the prosecution alleged that respondent "threatened physical harm or damage" to a person, which is outlawed under subsection (1)(a). The statute also criminalizes six other acts, including "falsely and deliberately reporting by message . . . that a person has been injured, has suddenly taken ill, has suffered death, or has been the victim of a crime or an accident," MCL 750.540e(1)(b), and "[d]eliberately engaging or causing to engage the use of a telecommunications service or device of another person in a repetitive manner that causes

In *Taravella*, the defendant was charged under MCL 750.540e with having made obscene or harassing telephone calls. He brought a motion to quash, contending that the statute was unconstitutionally overbroad because it allowed for punishment of constitutionally protected speech. *Id*. at 517-519. This Court acknowledged that the First Amendment limits "the extent to which states may punish or criminalize the use of words or language." *Id*. at 519. Therefore, a statute regulating speech "must be narrowly drawn so as not to infringe on constitutionally protected speech." *Id*. We upheld the statute's constitutionality by construing it as requiring both a malicious intent to annoy or terrorize or disturb the peace and quiet of another, and evidence that the defendant "*further* does one of the activities listed" in the statute's subsections. *Id*. at 523 (emphasis in original). Under subsection (a), a defendant must "[t]hreaten physical harm or damage *to* any person in the course of a conversation or message[.]" MCL 750.540e(1)(a) (emphasis added.)

Respondent did not undertake any acts consistent with threatening S, and no evidence substantiates that she intended to do so. Under MCL 750.450e, respondent's speech alone was not enough to establish criminal conduct. See also *People v Relerford*, 2017 IL 121094, ¶ 45; 104 NE3d 341 (2017) (in which the Illinois Supreme Court found unconstitutional a statute criminalizing communications "to or about a person" without requiring "any relationship— integral or otherwise—to unlawful conduct").

The prosecution asserts that respondent should have anticipated that the chat would be leaked to S, and that her responsibility may be inferred by her failure to understand that the Internet is not a secure place. It is true that respondent's texts were unwise in light of the risk that they would be seen by people outside the chat, but that does not suffice to prove the intent required by the statute, or to transform digital stupidity into criminal activity.

Here, and in the trial court, the prosecution propounds an argument premised on respondent's *negligence* rather than her specific intent to threaten S. Although it addresses an entirely different statute, we find analogous and helpful the United States Supreme Court's opinion in *Elonis v United States*, ___ US ___; 135 S Ct 2001; 192 L Ed 2d 1 (2015). The federal statute at issue in *Elonis* made "it a crime to transmit in interstate commerce 'any communication containing any threat . . . to injure the person of another.' " *Id*. at 2004 (citation omitted, alteration in original). Elonis posted "graphically violent language" on Facebook which included his wish to hurt his soon-to-be ex-wife and one of his coworkers. The subjects of the defendant's Facebook postings read his words and became fearful. *Id*. at 2005-2006. At trial, Elonis requested an instruction that "the government must prove that he intended to communicate a true threat." *Id*. at 2007 (quotation marks and citation omitted). The district court denied this request and instead informed the jury that

> A statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker

---

interruption in telecommunications service or prevents the person from utilizing his or her telecommunications service or device." MCL 750.540e(1)(g).

communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual. [*Id*. (quotation marks and citation omitted).]

Pertinent here, the government contended that Elonis could be convicted "if he himself knew the contents and context of his posts, and a reasonable person would have recognized that the posts would be read as genuine threats." *Id*. at 2011. The Supreme Court soundly rejected the government's argument, characterizing it as erecting "a negligence standard" inconsistent with the mental state required under the statute. *Id*. "[W]rongdoing must be conscious to be criminal," the Supreme Court reminded. *Id*. at 2009, citing *Morissette v United States*, 342 US 246, 252; 72 S Ct 240; 96 L Ed 288 (1952) (JACKSON, J.). "The 'central thought' " expressed in *Morissette*, the *Elonis* Court highlighted, "is that a defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as mens rea, scienter, malice aforethought, guilty knowledge, and the like." *Elonis*, 135 S Ct at 2009.

Respondent may not be punished because she negligently overlooked the possibility that someone else would show S the Snapchat contents. MCL 750.540e(1)(a) applies to respondent only if she meant to communicate her threats to S and actually threatened him. No evidence of record supports that she intended or carried out a threat, and we are unable to infer intent or an act from any of the testimony. The evidence that respondent lacked an intent to threaten S preponderates so heavily against the verdict that it would be a miscarriage of justice to allow it to stand.

We vacate the orders of adjudication and disposition.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle